# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

VINCENT DELANEY,

Plaintiff,

v.

CHARLES D. BAKER, in
his official capacity as
Governor of Massachusetts,

Defendant

CIVIL ACTION NO.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Plaintiff Vincent Delaney brings this Verified Complaint for Declaratory Judgment, Injunctive Relief, and Damages against Defendant Charles D. Baker in his official capacity as Massachusetts Governor, and alleges as follows:

## EXIGENCIES REQUIRING A TEMPORARY RESTRAINING ORDER

1.    Plaintiff brings this suit to challenge the statutory and constitutional authority of COVID-19 Executive Order No. 591 issued by Massachusetts Governor Charles D. Baker on March 10, 2020 declaring a State of Emergency pursuant to Chapter 639 of the Acts of 1950 and Section 2A of Chapter 17 of the General Laws for the Commonwealth of Massachusetts and all subsequent

Executive Orders issued pursuant thereto based upon a public health emergency posed by the COVID-19 pandemic.[1]

2.      Plaintiff brings this suit to challenge the issuance of Massachusetts Governor Baker's Executive Orders since March 10, 2020, which have substantially infringed upon and burdened his constitutional and statutory rights to Freedom of Religion, Freedom of Conscience, Freedom of Assembly, Right to Privacy, Right to Due Process, Freedom of Speech, Privileges and Immunities, and his Right to Make Personal Health Care Decisions.

3.      Plaintiff brings this suit to challenge Governor Charles D. Baker's issuance of Executive Orders since March 10, 2020 regarding the classification of essential and nonessential businesses and activities in the Commonwealth of Massachusetts during the State of Emergency, which is still ongoing, thereby depriving him of his liberty and property interests.

4.      Plaintiff brings this suit to challenge Governor Charles D. Baker's issuance of Executive Orders since March 10, 2020 as they relate to unproven theories and assumptions about the nature and spread of an alleged "novel coronavirus" referred to as SARS CoV-2 which, while reportedly first isolated and measured in December 2019 was not independently confirmed as a causative agent of an unique set of clinical presentations subsequently classified as COVID-19,

---

[1] See Executive Order No. 591, and Section 2A of M.G.L. Chapter 17, Attached as Exhibit 1.

and not on objective scientific and medical research. The consequences of relying on faulty assumptions have led to Orders that have infringed on Plaintiff's fundamental, constitutional, and statutory rights.

5.     The public's interest will be advanced by granting the requested declaratory and injunctive relief because the public favors that the Governor act within his authority, comply with applicable law governing the enactment of legislation, and uphold the  Constitutional and statutory rights of all the inhabitants on the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

6.     This action raises federal questions under the United States Constitution, specifically the First, Fourth, Fifth, Ninth and Fourteenth Amendments, and is brought pursuant to 42 U.S.C. § 1983.

7.     The Court has jurisdiction over Plaintiff's federal claims under the United States Constitution, Article III, Sec. 2 and 28 U.S.C. §§ 1331 and 1343.

8.     The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

9.     The Court has authority to grant the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202, and the requested temporary restraining order and injunctive relief pursuant to Federal Rule Civil Procedure 65.

10.     The Court is authorized to grant the Plaintiff reasonable costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 198 and M.G.L. c.12 § 11I.

## PLAINTIFF

11.     Plaintiff, Vincent Delaney, ("Plaintiff") presently resides at 6 County Street, Peabody, MA and is the owner and operator of VIP Mechanical Company, a HVAC installation and repair business.

## DEFENDANT

12.     Defendant, Charles D. Baker, ("Governor Baker") Governor of the Commonwealth of Massachusetts, is sued in his official capacity because he is responsible for declaring, enacting, and enforcing the COVID-19 Executive Orders at issue herein.

## INTRODUCTION

13.     Plaintiff, among other remedies, principally seeks a declaratory judgment and injunctive relief stating that Governor Baker's Executive Orders are null and void because they exceed his statutory emergency powers. Plaintiff seeks a declaratory judgment and injunctive relief stating that same Orders are null and void for the reasons stated above and explained further below.

## FACTS

14.     In late December 2019, the World Health Organization China Country Office was informed of cases of people developing a severe pneumonia-like illness from a coronavirus of unknown origin.[2]

15.     On January 21, 2020, the U.S. reported its first case of coronavirus in Washington thought to be linked to what foreign sources had described as a "new" coronavirus.

16.     On January 31, 2020, Health and Human Services Secretary Alex M. Azar II, relying on information provided by foreign sources, declared a Public Health Emergency for the United States.[3]

17.     On February 11, 2020, the World Health Organization ("WHO") selected the name COVID 19 distinct from the virus which was designated as SAR CoV-2.[4]

18.     Asserting the Civil Defense state of emergency, Governor Baker issued Executive Order No. 591: Declaration of a State of Emergency to Respond to COVID-19 on March 10, 2020.[5] The principal stated purposes of Exec. Order No. 591 was "to take additional steps to prepare for, respond to, and mitigate the

---

[2] https://www.who.int/csr/don/05-january-2020-pneumonia-of-unkown-cause-china/en/
   https://www.nytimes.com/2020/01/08/health/china-pneumonia-outbreak-virus.html.
[3] https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-
   coronavirus.html
[4] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-
   disease-(covid-2019)-and-the-virus-that-causes-it
[5] https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-covid-19

spread of COVID-19 to protect the health and welfare of the people of the Commonwealth[.]"

19.    In his Executive Order, Governor Baker recited several questionable statements, including:

a    reporting that the January 31, 2020 declaration of a public health emergency was in response to "the 2019 novel Coronavirus ("COVID-19")." This statement is misleading because it conflates the SAR CoV-2 virus and a set of clinical, laboratory, or epidemiologic criterion used to classify the disease known as "COVID-19";

b    that the "disease caused by the 2019 novel Coronavirus" was caused by the virus; contagious; and, at times fatal, despite no concrete evidence demonstrating the unique pathogenicity of this SARS virus in contrast with other known or unknown SARS viruses;

c    "confirmed cases" which are neither defined nor confirmed;

d    the stipulation, without evidence, that there is a causal relationship between the virus and death which was not available at the time; and,

e    that there were 91 "presumed positive cases of COVID-19" which evidences a lack of precision. The term "positive" being the result of a test, not the subjective classification of idiopathic clinical symptom presentation.

20.    The WHO declared the novel coronavirus a pandemic on March 11, 2020.[6]

21.    The Council of State and Territorial Epidemiologists Infectious Disease Committee created a standardized case definition for 2019 novel coronavirus disease (COVID-19), which includes asymptomatic infections caused by Severe Acute Respiratory Syndrome Coronavirus-2 (SARS-CoV-2). The

---

[6] https://www.who.int/emergencies/diseases/novel-coronavirus-2019.

Committee recognized SARS-CoV-2 as the "virus that causes 2019 novel coronavirus disease (COVID-19), and added "COVID-19 to the list of nationally notifiable conditions."[7]

22.    Whether a person, in either an outpatient or telehealth setting, presents with "COVID-19," a notifiable condition  to "public health authorities," is evaluated with clinical, laboratory, or epidemiologic linkage evidence.[8] Sufficient criterion to classify a clinical case requires two of more symptoms of fever (measured or subjective), chills, rigors, myalgia, headache, sore throat, or new olfactory and taste disorder(s); OR just a cough or shortness of breath or difficulty breathing; OR Severe respiratory illness predominantly by a broad range of clinical and epidemiological criterion.[9] Within 14 days of exposure of "close contact with a confirmed or probable case of COVID-19," OR close contact with a person with a "clinically compatible illness" and a linkage to a confirmed COVID-19 disease is sufficient epidemiological linkage evidence to classify a COVID-19 case.[10]

23.    In March, 2020, the CDC and the National Institute of Allergies and Infectious Diseases ("NIAID") classified COVID-19 by symptom presentation alone.

---

[7] https://cdn.ymaws.com/www.cste.org/resource/resmgr/2020ps/interim-20-id-01_covid-19.pdf
[8] *Id.*, P. 10.
[9] *Id.*
[10] *Id.*

24.     On March 12, 2020, Governor Baker issued an Order "suspending certain provisions of the Open Meeting Law."[11]

25.     On March 13, 2020, Governor Baker issued an "Order prohibiting gatherings of more than 250 people,"[12] which was rescinded two days later and superseded by an "Order prohibiting gatherings of more than 25 people and on-premises consumption of food or drink."[13] (See Exhibit Nos. 2 and 3 attached hereto).

26.     On March 15, 2020, Governor Baker issued Orders "Temporarily Closing All Public and Private Elementary and Secondary Schools,"[14] "authorizing the registrar of motor vehicles to temporarily extend licenses, permits, and other identification cards,"[15] and "Expanding Access to Telehealth Services and Protect Health Care Providers."[16]

27.     On March 16, 2020, the White House, under the advisement of the Centers for Disease Control ("CDC"), issued guidance intended to slow the spread of the coronavirus in the United States.[17]

28.     The CDC advisories to stop the spread of the COVID-19 are not based on scientific evidence, and do not justify state mandates that order the closure of

---

[11] https://www.mass.gov/doc/open-meeting-law-order-march-12-2020/download
[12] https://www.mass.gov/doc/order-prohibiting-gatherings-of-more-than-250-people/download
[13] See Executive Order of March 13, 2020, Attached as Exhibit 2.
[14] https://www.mass.gov/doc/march-16-2020-k-12-school-closing-order/download
[15] https://www.mass.gov/doc/march-15-2020-rmv-license-extensions/download
[16] https://www.mass.gov/doc/march-15-2020-telehealth-order/download
[17] *See* The President's Coronavirus Guidelines for America, *30 Days to Slow the Spread* (March 31, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

broad segments of the economy and daily life, require people to physically separate from others in daily life, and require people to wear masks.[18]

29.   On March 17, 2020, Governor Baker issued COVID-19 Orders "extending the registrations of certain licensed health care professionals"[19] and "expanding access to physician services."[20]

30.   On March 18, 2020, Governor Baker issued an Order "temporarily closing all child care programs and authorizing the temporary creation and operation of emergency child care programs."[21]

31.   On March 20, 2020, Governor Baker issued an Orders "permitting the temporary conditional deferral of certain inspections of residential real estate"[22] and "authorizing actions to reduce in-person transactions associated with the licensing, registration, and inspection of motor vehicles."[23]

---

[18] The studies and commentary cited by the CDC do not concern masks worn by healthy people in daily life and all call for further study: Rothe C, Schunk M, Sothmann P, et al. Transmission of 2019-n CoV Infection from an Asymptomatic Contact in Germany. The New England journal of medicine. 2020;382(10):970-971: Zou L, Ruan F, Huang M, et al. SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients. The New England journal of medicine. 2020;382(12):1177-1179; Pan X, Chen D, Xia Y, et al. Asymptomatic cases in a family cluster with SARS-CoV-2 infection. The Lancet Infectious diseases. 2020; Bai Y, Yao L, Wei T, et al. Presumed Asymptomatic Carrier Transmission of COVID19. Jama. 2020; Kimball A HK, Arons M, et al. Asymptomatic and Presymptomatic SARS-CoV-2 Infections in Residents of a Long-Term Care Skilled Nursing Facility — King County, Washington, March 2020. MMWR Morbidity and mortality weekly report. 2020; ePub: 27 March 2020; Wei WE LZ, Chiew CJ, Yong SE, Toh MP, Lee VJ. Presymptomatic Transmission of SARS-CoV-2 — Singapore, January 23–March 16, 2020. MMWR Morbidity and mortality weekly report. 2020;ePub: 1 April 2020; Li R, Pei S, Chen B, et al. Substantial undocumented infection facilitates the rapid dissemination of novel coronavirus (SARS-CoV2). Science (New York, NY). 2020.
[19] https://www.mass.gov/doc/march-17-2020-registration-of-health-care-professionals-order/download
[20] https://www.mass.gov/doc/march-17-2020-expand-access-to-physician-services-order/download
[21] https://www.mass.gov/doc/march-18-2020-early-education-and-care-order/download
[22] https://www.mass.gov/doc/march-20-2020-smoke-alarm-inspections-order/download
[23] https://www.mass.gov/doc/march-20-2020-rmv-order/download

32.    On March 23, 2020, Governor Baker issued COVID-19 Order No. 13 "Assuring continued operation of essential services in the Commonwealth, closing certain workplaces, and prohibiting gatherings of more than 10 people."[24]

33.    In Order No. 13, Governor Baker, in his sole discretion, without due process or any scientific or medical justification, listed the businesses that were deemed as "essential"[25] and allowed to continue normal operations. All other lawful and licensed businesses within the Commonwealth, under penalty of the Order, had to close all on-site operations.

34.    On March 26, 2020, Governor Baker issued COVID-19 Order No. 18 "extending certain professional licenses, permits, and registrations issued by Commonwealth agencies"[26] and an Order "suspending state permitting deadlines and extending the validity of state permits."[27]

35.    On March 30, 2020, Governor Baker issued COVID-19 Order No. 19 "regarding the conduct of shareholder meetings by public companies"[28] and COVID-19 Order No. 20 "authorizing the Executive Office of Health and Human Services to adjust essential provider rates during the COVID-19 public health emergency." [29]

---

[24] See Executive Order No. 13, attached as Exhibit 3.
[25] https://www.mass.gov/doc/covid-19-essential-services/download
[26] https://www.mass.gov/doc/march-26-2020-business-licensure-extension-order/download
[27] https://www.mass.gov/doc/march-26-2020-permit-extension-order/download
[28] https://www.mass.gov/doc/virtual-shareholder-meeting-order/download
[29] https://www.mass.gov/doc/eohhs-provider-rates-order/download

36.   On March 31, 2020, Governor Baker issued Order No. 21 "extending the closing of certain workplaces and the prohibition on gatherings of more than 10 people."[30] (See Exhibit No. 4-Order No. 21 attached hereto).

37.   The "New COVID-19 Essential Services List"[31] attached to the March 31st Order, expanded which businesses qualified as "essential," but nevertheless indicated which businesses were allowed to remain open and which were required to remain closed.

38.   On April 9, 2020, Governor Baker issued COVID-19 Orders No. 24 "Authorizing Nursing Practice by Graduates and Senior Students of Nursing Education Programs"[32] and No. 25 "Expanding Access to Inpatient Services."[33]

39.   On April 16, 2020, Governor Baker issued an Order "Authorizing the Creation and Operation of Emergency Residential Programs and Emergency Placement Agencies for Children."[34]

40.   On April 21, 2020, Governor Baker issued COVID-19 Order No. 27, "Extending the Temporary Closing of All Non-Emergency Child Care Programs".[35]

---

[30] https://www.mass.gov/doc/march-31-2020-essential-services-extension-order/download
[31] https://www.mass.gov/doc/march-31-essential-services-list/download
[32] https://www.mass.gov/doc/april-9-2020-nursing-school-students/download
[33] https://www.mass.gov/doc/april-9-2020-inpatient-services-and-billing/download
[34] https://www.mass.gov/doc/april-16-2020-eec-order/download
[35] https://archives.lib.state.ma.us/bitstream/handle/2452/825849/on1145855957-2020-04-21-child_care_program_closure_extension.pdf?sequence=1&isAllowed=y

41.    On April 28, 2020, Governor Baker issued COVID-19 Order No. 29 "Revised Order Allowing for Remote Participation for the Governor's Council"[36] and COVID-19 Order No. 30 "Further Extending the Closing of Certain Workplaces and the Prohibition on Gatherings of more than 10 People."[37]

42.    On May 1, 2020, Governor Baker issued COVID-19 Order No. 31 "Requiring Face Coverings in Public Places Where Social Distancing is not Possible."[38] (See Exhibit No. 5- Order No. 31 attached hereto).

43.    On May 15, 2020, Governor Baker issued COVID-19 Order No.13 "Temporarily Extending COVID-19 Order No. 32." [39] On May 18, 2020, Governor Baker issued COVID-19 Order No. 33 "Implementing a Phased Reopening of Workplaces and Imposing Workplace Safety Measures to Address COVID-19"[40] and  COVID-19 Order No. 34 "Expanding Access to and Use of State Beaches and Addressing Other Recreational Activities."[41] (See Exhibit No. 6- Order No. 33 attached hereto).

44.    Contrary to science and common sense, COVD-19 Order No. 34 restricts the movement of healthy adults in relation to each other outside in the sun, and on beaches where the threat of contagion is minimal.

---

[36] https://www.mass.gov/doc/signed-governors-council-extension-order/download
[37] https://www.mass.gov/doc/signed-second-extension-of-essential-services-order/download
[38] https://www.mass.gov/doc/may-1-2020-masks-and-face-coverings/download
[39] https://www.mass.gov/doc/may-15-2020-24-hour-extension-order/download
[40] https://www.mass.gov/doc/may-18-2020-re-opening-massachusetts-order/download
[41] https://www.mass.gov/doc/may-18-2020-expanded-beach-access/download

45.     On June 1, 2020, Governor Baker issued COVID-19 Order No. 35

"Clarifying the Progression of the Commonwealth's Phased Workplace Re-

Opening Plan and Authorizing Certain Re-opening Preparations at Phase II

Workplaces."[42]

46.     On June 6, 2020, Governor Baker issued COVID-19 Order No. 38

"Revised Order Regulating Gatherings Throughout the Commonwealth." The

Order requires six feet or more physical separation from every other person and

requires that all persons over the age of 2 wear face masks "unless they are

prevented from wearing a face covering by a medical or disabling condition."[43]

Prohibitions under the Order include all manner of social, sports, educational,

entertainment, commercial, civic, and leisure gatherings "without limitation" of

more than 10 persons in close proximity "throughout the Commonwealth."

47.     COVID-19 Order No. 38 is not based on public health concerns about

the nature and spread of a coronavirus, evidenced by the Order's allowance of

"gatherings for the purpose of political expression" and in its exemptions for

municipal legislative bodies, the General Court, the Judiciary, federal government

entities, healthcare facilities or providers, schools, residential programs, childcare

facilities, homeless facilities, and DYS, DMH, and DDS facilities. Violations of

the Order are civil fines of $300 per violation. The Order is of an indefinite

---

[42] https://www.mass.gov/doc/order-preparing-for-phase-ii-reopening/download
[43] https://www.mass.gov/doc/june-6-2020-regulating-gatherings-throughout-the-commonwealth/download

duration because it extends "until the state of emergency is ended,[44] which is open-ended at this time.

48.    The Reopening Advisory Board cautioned, " Public health data trends indicating significant increases in viral transmission could result in returning to prior phases or closing sectors of the economy."[45]

49.    Governor Baker, by and through the Reopening Advisory Board, promulgated a plan to "reopen" Massachusetts ("Reopen Plan") that is based on fluid and indeterminate public health metrics that measure testing capacity, testing results, hospitalizations, deaths, healthcare system readiness, and contract tracing capabilities. The metrics are dependent on increasing testing capacity, increasing contact tracing and quarantine.[46]

50.    "Social Guidance" under the Reopen Plan includes "cover your face" and "socially distance". Mandatory Workplace Safety Standards require "social distancing" inside and outside and face coverings or masks for all employees. Additional Sector-Specific Protocols and best practices guidance were also promulgated by the Baker-Polito administration. "Businesses are expected to implement these protocols in addition to the more general Mandatory Workplace Safety Standards."[47]

---

[44] *Id.*
[45] *Id.*, p.5.
[46] https://www.mass.gov/doc/reopening-massachusetts-may-18-2020/download
[47] *Id.*

51.    The Reopen Plan calls for a four phased reopening: Phase 1 "Stay at home", Phase 2 "Cautious", Phase 3 "Vigilant", and Phase 4 "New Normal".[48] Each phase is expected to last three weeks or longer, but "the entire Commonwealth may need to return to an earlier phase" if, in the estimation, their "public health data trends are negative."[49]

52.    Even in the "New Normal," the final fourth stage to reopen Massachusetts, when the metrics indicate minimal risk, all public interactions will still require "physical distancing" and permitted gathering sizes are as yet indeterminate.

53.    The Reopen Plan will allow the full resumption of worship activity in the 'new normal'". The "new normal" is not defined.[50] The reopen plan arbitrarily and capriciously limits and restricts faith-based activities, while allowing businesses, night clubs, and recreation "full resumption of activity".[51]

54.    The original justification for shutting down major segments of the economy and excessive governmental intrusion into private lives was to prevent a healthcare system collapse that never materialized and is no longer considered a risk. Even assuming, without conceding, that Governor Baker's Orders appeared to be constitutionally appropriate in early March, there is no objective current health

---

[48] *Id.*, p. 12.
[49] *Id.*
[50] *Id.* p. 15.
[51] *Id.*, ps. 14-16.

emergency to warrant their continued and profound intrusion into private lives and lawful businesses where they have been ordered to continue in Massachusetts for a vague and uncertain duration.

55.     An antibody study done in Boston showed that approximately 1 in 10 residents had Covid-19 without symptoms, which means the mortality rate is estimated to be at least four times lower than is being reported.[52]

56.     According to the CDC, COVID-19 presents a statistically insignificant threat to the health of children, young adults, and healthy adults.[53]

57.     According to the CDC, COVID-19 deaths are being included with pneumonia and influenza deaths and are based on death certificate data only.  Even with the combined death rates of COVID-19, including deaths by pneumonia and influenza, the mortality rate this year has been equal to that of a bad influenza season.[54]  "Based on death certificate data, the percentage of deaths attributed to pneumonia, influenza or COVID-19 ("PIC") decreased from 12.4% during week 22 to 7.3% during week 23 but remained above baseline. This is the seventh week of a declining percentage of deaths due to PIC, but this percentage may change as more death certificates are processed, particularly for recent weeks."[55]

---

[52] https://www.boston.gov/news/results-released-antibody-and-covid-19-testing-boston-residents. Boston Antibody Study Mortality Rate by age: 0-19: 0.0%; 20-29: 0.02%; 30-39: 0.04%; 40-49: 0.12%; 50-59: 0.4%; 60-69: 1.4%.
[53] https://www.mass.gov/doc/covid-19-dashboard-june-5-2020/download
[54] Fauci, Anthony. N ENGL J MED 382;13 March 26, 2020.
[55] https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html

58.     While the number of COVID-19 cases reported to CDC is cumulative and continues to fluctuate nationally, the proportion of visits to outpatient providers and emergency departments for illnesses with symptoms consistent with COVID-19 continues to decline or remain stable at low levels.[56] The CDC estimates that there has been 24,000 to 62,000 flu deaths from October 1, 2019- April 4, 2020.[57]

59.     There is no evidence that Governor Baker's Orders have lessened the impact of COVID-19, but there is mounting evidence that the orders are causing great harm,[58] including increasing the transmission rates[59] and prolonging the epidemic.[60]

60.     The continuing shutdown and slow reopening is slowing the ability of the population from achieving herd immunity, which protects vulnerable populations. Dr. Russell Blaylock, M.D, wrote, after a comprehensive review of studies relating to face masks that, "It is evident from this review that there is insufficient evidence that wearing a mask of any kind can have a significant impact

---

[56] *Id.*

[57] https://www.cdc.gov/flu/about/burden/preliminary-in-season-estimates.htm

[58] Anxiety, depression, depression in children suicides, and abuse are all on the rise. https://www.psychologytoday.com/us/blog/helping-kids-cope/202005/the-silent-pandemic-depression-self-harm-and-suicide

[59] MacIntyre CR, et al. *BMJ Open* 2015. Scientists "caution against the use of cloth masks". The study noted that problems with moisture retention, reuse of cloth masks and poor filtration may result in increased risk of infection." and HHS Secretary Azar that wearing facemasks may ultimately may make an outbreak worse, and that the CDC "does not recommend that people who are well wear a face mask". He cautioned that "putting on a face mask without proper fitting and training could actually increase your risk". https://www.cbsnews.com/news/coronavirus-prevention-face-mask-not-helpful-wash-hands/

[60] https://www.nydailynews.com/coronavirus/ny-coronavirus-cuomo-coronavirus-stats-20200506-eyqui4b5lfdn7g6cqswkf6otly-story.html

in preventing the spread of this virus. The fact that this virus is a relatively benign infection for the vast majority of the population and that most of the at-risk groups also survive, from an infectious disease and epidemiological standpoint, by letting the virus spread through the healthier population, we will reach a herd immunity level rather quickly that will end this pandemic quickly and prevent a return next winter."[61]

61.     Mandating the use of masks when the practice has not been proven to offer any discernable protection to the wearer or the public, but instead is known to cause injury [62] and death,[63] infringe on Plaintiff's fundamental rights and liberties.

62.     The CDC has stated that "the primary and most important mode of transmission for COVID-19 is through close contact from person-to-person."[64] The

---

[61] Russell Blaylock, M.D., "Blaylock: Face Masks Pose Serious Risks to the Healthy," *Technocracy News & Trends*, May 21, 2020, https://www.technocracy.news/blaylock-face-masks-pose-serious-risks-to-the-healthy/
[62] Inadequacies of face masks: MacIntyre CR, Chughtai AA. Facemasks for the prevention of infection in healthcare and community settings. BMJ 2015; 350:h694; Brosseau LM, Jones R. Commentary: Health workers need optimal respiratory protection for Ebola. Center for Infectious Disease Research and Policy. September, 2014.; Harriman KH, Brosseau LM. Controversy: Respiratory Protection for Healthcare Workers. April, 2011. http://www.medscape.com/viewarticle/741245_print; Respirators and Surgical Masks: A Comparison. 3 M Occupational Health and Environment Safety Division. Oct. 2009; Johnson DF, Druce JD, Birch C, Grayson ML. A Quantitative Assessment of the Efficacy of Surgical and N95 Masks to Filter Influenza Virus in Patients with Acute Influenza Infection. Clin Infect Dis 2009; 49:275-277; Weber A, Willeke K, Marchloni R et al. Aerosol penetration and leakage characteristics of masks used in the health care industry. Am J Inf Cont 1993; 219(4):167-173; Yassi A, Bryce E. Protecting the Faces of Health Care Workers. Occupational Health and Safety Agency for Healthcare in BC, Final Report, April 2004; Zhou Cd, Sivathondan P, Handa A. Unmasking the surgeons: the evidence base behind the use of facemasks in surgery. JR Soc Med 2015; 108(6):223-228; Brosseau L, Jones R. Commentary: Protecting health workers from airborne MERS-CoV- learning from SARS. Center for Infectious Disease Research and Policy May 2014; Oberg T, Brosseau L. Surgical mask filter and fit performance. Am J Infect Control 2008; 36:276-282; Lipp A. The effectiveness of surgical face masks: what the literature shows. Nursing Times 2003; 99(39):22-30; Do surgical masks protect workers? OSH Answers Fact Sheets. Canadian Centre for Occupational health and Safety. Updated August 2016.
[63] Man Wearing N95 Mask Passes Out While Driving Car, Crashing into Pole https://people.com/human-interest/man-wearing-n95-mask-passes-out-while-driving-car-crashing-into-pole/; Two boys drop dead in China while wearing masks during gym class https://nypost.com/2020/05/06/two-boys-drop-dead-in-china-while-wearing-masks-during-gym-class/;

CDC announced that the infection is spread through "respiratory droplets produced when an infected person coughs, sneezes, or talks," with the latter *possibly* including from people "who are not showing symptoms."[65]

63.    The SARS CoV-2 virus has not been definitely shown to spread or be transmitted from asymptomatic people, as reported by Dr. Maria Van Kerkhove, head of WHO's Emerging Diseases and Zoonosis Unit at a news briefing at the United Nations agency's Geneva headquarters. "It's very rare," she said.[66]

## Governor Baker's Orders Rely on Assumed Authority

64.    Governor Baker expressly claimed authority to declare a State of Emergency pursuant to Chapter 639 of the Acts of 1950 and also pursuant to M.G.L. c. 17, § 2A.  Mass. Exec. Order No. 591.[67] Chapter 639, entitled "Civil Defense Act," is a special law not codified in the General Laws.[68]

65.    Under the Civil Defense Act, the governor may issue a proclamation or proclamations setting forth a state of emergency. Spec. L. c. S31, § 5.

66.    The Civil Defense Act's purpose is for limited uses, to be rarely invoked and only when the legislature has deemed it as absolutely necessary and

---

[64] Centers for Disease Control and Prevention, "CDC updates COVID-19 transmission webpage to clarify information about types of spread", *CDC.gov*, reviewed May 23, 2020, accessed June 4, 2020, https://www.cdc.gov/media/releases/2020/s0522-cdc-updates-covid-transmission.html.

[65] Centers for Disease Control and Prevention, "How COVID-19 Spreads", *CDC.gov*, June 12, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html

[66] http://terrance.who.int/mediacentre/presser/WHO-AUDIO_Emergencies_Coronavirus_Press_Conference_08JUN2020.mp3.

[67] See Executive Order No. 591, Attached as Exhibit 1.

[68] See Exhibit 1, Spec. L. c. S31, §§ 1-22.

essential for the welfare and safety of the citizens. § 1 of the Civil Defense Act enumerates with specificity the particular reasons for its application. The legislature realized the enormity of the Act's powers that would be concentrated in the hands of one individual and the concomitant responsibility of exercising it prudently and wisely. Thus, it is an exceptional delegation of legislative authority and the legislature intended for it to be invoked only in rare and exceptional circumstances in order to prevent unwarranted abuse of power and arbitrary, capricious and irrational orders being promulgated.

67.   Governor Baker's reliance on the Civil Defense Act has resulted in the very circumstances the legislature sought to avoid.

68.   The COVID-19 public health matter is not even remotely an event, standing alone, that was contemplated by the legislature when the Act was enacted in the backdrop of the former USSR's atomic bomb detonation in 1949 and at the commencement of the Korean Conflict. It is clear that the Act was meant to protect Massachusetts' residents in the event of a war or actions taken against the United States of a war-like nature without a formal declaration of war made by an enemy.

69.   Whether COVID-19 is naturally occurring or not, it cannot be considered to fit within the definition of the Act's plain and ordinary meaning of its words that could justify the declaration of a Civil Defense State of Emergency.

70.    Indeed, nothing even remotely listed in §§ 1 & 5 of the Act could be read to suggest that COVID-19 is equivalent to or rises up to the level of an attack or natural cause substantially affecting the environment or other real and personal property of the state's infrastructure and its inhabitants.

71.    The Act lists specific events that trigger a governor's authority to declare a Civil Defense State of Emergency, which depend upon if and when the Congress of the United States shall declare war, or if and when the President of the United States shall by proclamation or otherwise inform the governor that the peace and security of the Commonwealth are endangered by belligerent acts of any enemy of the United States or of the Commonwealth or by the imminent threat thereof; or upon the occurrence of any disaster or catastrophe resulting from attack, sabotage or other hostile action; or from riot or other civil disturbance; or from fire, flood, earthquake or other natural causes; or whenever because of absence of rainfall or other cause a condition exists in all or any part of the Commonwealth whereby it may reasonably be anticipated that the health, safety or property of the citizens thereof will be endangered because of fire or shortage of water or food; or whenever the accidental release of radiation from a nuclear power plant endangers the health, safety, or property of people of the Commonwealth. Spec. L. c. S31, § 5, cl. 1. See also § 1. cl. 1.

72.    As Executive Order No. 591 and subsequent orders issued by the

Defendant make clear, none of the triggering events identified in Spec. L. c. S31, §

5, cl. 1, has occurred in Massachusetts. This is so because COVID-19 is strictly a

health matter and not an event that obviously fits in with the events contemplated

in the statute. It is clearly not physically destructive within the meaning of the

language of the statute. Words must be given their ordinary and plain meaning

when construing a statute as well as the drafters intent.

73.    All of Governor Baker's COVID-19 related orders have likewise been

issued based upon his asserted powers as set forth in "Sections 5, 6, 7, 8, and 8A of

Chapter 639 of the Acts of 1950, as amended, and other provisions of law[.]"

Mass. Exec. Order No. 591.

74.    The Governor's Civil Defense State of Emergency powers include,

but are not limited to:

a    taking possession of real and personal property (Spec. L. c. S31, § 5(b));

b    taking measures to effectuate presidential requests related to the national
     defense or the public safety (Spec. L. c. S31, § 6);

c    exercising "any and all authority over persons and property, necessary or
     expedient for meeting said state of emergency, which the general court in
     the exercise of its constitutional authority may confer upon him" (Spec. L.
     c. S31, § 7);

d    enforcing Civil Defense State of Emergency executive orders with
     imprisonment of up to one year, a fine up to $500, or both (Spec. L. c.
     S31, § 8); and

e    suspending any "general or special law or of any rule, regulation,
     ordinance or by-law to the extent that such provision is inconsistent with

any order or regulation issued or promulgated" pursuant to Civil Defense State of Emergency executive orders (Spec. L. c. S31, § 8A).

75.   Protecting residents of the Commonwealth from the dangers of the

COVID-19 health situation—or any pandemic or epidemic for that matter—does

not require nor allow for powers of this immense and pervasive scope of the Act.

Since there is no invasion, civil unrest, or destroyed infrastructure, there is no need

to suspend law. The legislature is free to make, amend or annul any statute, as the

health situation is monitored and as it warrants. It has just done that, for example,

with respect to housing by precluding tenant evictions from occurring and

preventing mortgage foreclosures due to the shutdown orders of the governor as

long as the state of emergency is in effect and the courts are not fully reopened.

The extraordinary powers under the Act are clearly not needed when there are

existing laws readily available to easily manage the fluid situation.

76.   As the Governor's declaration of a Civil Defense State of Emergency

notes, the World Health Organization has declared a "***Public Health Emergency*** of

International Concern[,]" U.S. Health and Human Services declared a "***public***

***health emergency*** for the entire United States[,]" and the Massachusetts DPH had

already formed a "***Public Health Incident Management Team*** to manage the

public health aspects of the incident[.]" Mass. Exec. Order No. 591 (emphasis

added).

77.    Thus, a Civil Defense crisis—and the extensive power to abrogate statutes granted to the governor to address a true Civil Defense crisis—are incongruous with the challenges posed by the COVID-19 health crisis. Health authorities were mobilized well before the Governor's declaration, armed with valid statutory authority, primarily M.G.L. c. 111, the Public Health Act, to directly address the challenges posed by an infectious disease outbreak that is dangerous to the public health. Governor Baker has incorrectly and unlawfully applied the Act to address COVID-19 and by doing so, he has unconstitutionally exercised legislative police power by using it for a purpose not intended for its use.

78.    COVID-19 does not fit within the meaning of "other natural causes" that justify a declaration of a Civil Defense State of Emergency. COVID-19 is not an "other natural cause" as prescribed by the Civil Defense Act. As explained in the Civil Defense Act's definitions, "civil defense" is "the preparation for and the carrying out of all emergency functions, other than functions for which military forces other than the national guard are primarily responsible, for the purpose of minimizing and repairing injury and damage resulting from disasters caused by attack, sabotage or other hostile action; or by riot or other civil disturbance; or by fire, flood, earthquake or other natural causes.[69]

---

[69] Spec. L. c. S31, § 1.

79.    "Other natural causes" can mean "only those things that share the characteristics of the terms that appear before it [.]" *See Commonwealth v. Escobar*, 479 Mass. 225, 229 (2018).

80.    The words used in the Act, such as disasters caused by attack, sabotage, or other hostile action, riots, fires, floods, radiation, chemicals, and earthquakes must be given their plain and ordinary meaning and obviously denote physical destruction and catastrophe to infrastructure and the like. The construction of fallout shelters are mentioned in § 2 of the Act. COVID-19 can hardly be equated to fall into this type of physical harm anticipated by the legislature when the Act was passed in 1950, particularly where the Cold War was full blown at the time and there were many issues the nation was concerned with, including the city of Berlin, China having just fallen to the communists the previous year, Korea, and the USSR's detonation of its first atomic weapon.

81.    The awesome and enumerated powers listed in the Act can only lead to one reasonable interpretation that the Act was only meant to be available to the governor for only the most serious threats to the state's infrastructure and people as a result of war, war-like actions or natural causes, such as extreme weather related incidents, and other events listed in §§ 1 and 5 of the Act. The Act contemplates physical devastation and the deleterious effects that such hostile actions and other natural causes could have upon the state's inhabitants. COVID-19, despite all the

major attention it has garnered, has not affected the state or the nation as predicted

by the many health "experts" and much of the mainstream media. It may require

our utmost attention, but it in no way can be held on the same plane as the events

listed in the Act. In fact, like all viruses known, the standard instructions are given

to stay home if ill, wash one's hands, do not touch one's face or eyes, and stay

away from anyone known to be sick. In other words, practice good hygiene and

common sense.

82.    Thus, as Executive Order No. 591 and subsequently issued orders

substantiate, the Act does not apply to COVID-19 because substantially all of the

actions taken by the governor have not dealt with anything remotely contemplated

by its provisions, as it is not a consequence of an attack, sabotage, riot, fire, flood,

earthquake, natural causes, such as weather or explosions, or anything else that can

even be considered in those terms.

83.    This virus may be highly contagious, but it has a very low mortality

rate and no extensive medical treatment is required for the majority of those

infected.

84.    One need only look at the economic devastation wrought by the

Executive Orders of Governor Baker, such as the shuttering of industries wholesale

and the irrational, arbitrary and capricious manner of deciding which businesses

were/are essential and which were/are not. One can likely posit that if a catastrophe

occurred that was contemplated within the meaning of the Act, the essentials of life would have surely take on a more dire and limited definition.

85.     A review of the history of declared state of emergencies in the Commonwealth of Massachusetts since the Act's enactment in 1950 reveals that twelve declarations have been promulgated. All have been weather related but two declarations, both of these occurring a few weeks apart on September 14, 2018 and October 4, 2018, respectively, which dealt which the tragic natural gas explosions that occurred in Lawrence, Andover and North Andover. All twelve declarations preceding Executive Order No. 591 would squarely fit within the meaning of the Act's terms involving fire, flood, etc. or "other natural causes".[70]

86.     All of the pre-COVID-19 incidents remedied by the Civil Defense Act were related to damage to land by extreme weather, fire or floods, physical injuries to survivors, loss of electrical power, and temporary emergency shelter arrangements for those fortunate to survive. These are clearly the type of events that the legislature contemplated when enacting the Act and squarely fit within the meaning of its prescribed uses. Until March 10, 2020, the Act had never been invoked to solely manage a health related matter in its seventy year history. This is a case of first impression.

---

[70] Massachusetts Emergency Management Agency, State of Emergency Declarations, https://www.mass.gov/service-details/state-of-emergency-information.

87.    The Massachusetts Legislature has delegated authority to the

Executive Branch to stop the spread of infectious diseases in the Public Health Act.

The legislature delegated to the executive branch the authority to act decisively in

the event of an infectious disease outbreak. The statutory authority is not the c. 639

of the Act of 1950, but rather the Public Health Act, Massachusetts General Laws

Chapter 111, et seq.

88.    The Public Health Act tasks the Department of Public Health, its

Commissioner, its Council, and local boards of public health, with the

responsibility of protecting the public from "disease dangerous to the public

health." G.L. c. 111, § 1.

89.    The Commissioner "may direct any executive officer or employee of

the department to assist in the study, *suppression or prevention of disease* in any

part of the Commonwealth." G.L. c. 111, § 2 (emphasis added).

90.    DPH has the duty to investigate "the causes of disease, and *especially*

*of epidemics*[.]" G.L. c. 111, § 5 (emphasis added). It has the "power to define ...

what diseases shall be deemed dangerous to the public health, and *shall make such*

*rules and regulations* consistent with law for the *control and prevention of such*

*diseases* as it deems advisable for the protection of the public health." G.L. c. 111,

§ 6 (emphasis added).

91.   If DPH declares a contagious or infectious disease dangerous to the public health "or it is likely to exist in any place within the commonwealth," DPH must investigate the means of preventing the spread of the disease and consult with local authorities. G.L. c. 111, § 7.

92.   No medical or scientific precedent exists for the conduct of restrictions placed on the healthy as either "suppression or prevention" as this action is limited in literature and practice to quarantining the infected.

93.   The Public Health Act addresses some infectious diseases by name, delegating to the DPH the "responsibility for conducting programs aimed at controlling and eradicating tuberculosis in the commonwealth." G.L. c. 111, § 81. For instance, it allows local health boards to transform hospitals' tuberculosis facilities into divisions "for the care and treatment of persons suffering from other diseases of the chest[.]" G.L. c. 111, § 91C.

94.   As SARS CoV-2 relies on the ACE2 receptor which targets the lungs, the "diseases of the chest" delimitation is relevant.[71]

95.   DPH may require towns to establish "hospitals for the reception of persons having smallpox, diphtheria, scarlet fever, or other diseases dangerous to the public health[.]" G.L. c. 111, § 92. These "isolation hospitals," as Public Health

---

[71] https://www.jwatch.org/na51115/2020/03/18/ace2-sars-cov-2-receptor-required-cell-entry

Act calls them, are subject to the orders and regulations of local boards of health.
*Id.*

96.     In the event of an infectious disease outbreak that is dangerous to the
public health, the Public Health Act directs local boards of public health to
"provide such hospital or place of reception and such nurses and other assistance
and necessaries as is judged best for his accommodation and for the safety of the
inhabitants[.]" G.L. c. 111, § 95. The statute focuses on the importance of isolation
of "sick or infected" individuals. *See id.*

97.     In some circumstances, a local board of health may seek a
magistrate's warrant "to remove any person infected with a disease dangerous to
the public health or who is a carrier of the causative agent thereof, or to take
control of convenient houses and lodgings, and to impress into service and use
such convenient houses, lodgings, nurses, attendants and other necessaries." G.L.
c. 111, § 96.

98.     The Public Health Act prohibits transportation of people infected with
a disease dangerous to the public health to other towns without first obtaining
assent from the receiving town's board of health, except for transportation to a
hospital. G.L. c. 111, § 96A.

99.    "Boards of health may grant permits for the removal of any nuisance, infected articles or sick person within the limits of their towns." G.L. c. 111, § 98. Warrants may be issued to seize infected personal property. G.L. c. 111, § 99.

100.    "If a disease dangerous to the public health exists in a town, the selectmen and board of health shall use all possible care to prevent the spread of the infection and may give public notice of infected places by such means as in their judgment may be most effectual for the common safety." G.L. c. 111, § 104. The statute sets the penalty for obstructing health notices between $10 and $100. *Id.*

101.    Local boards of health may "examine" and "restrain" travelers entering Massachusetts from infected places outside the Commonwealth. G.L. c. 111, § 106. Boards may allow travelers to continue their journeys upon receipt of a board-issued license. Upon command by a board, a traveler coming from an infected place who does not return from where he or she came is subject to a fine up to $100. *Id.*

102.    If a physician examines a patient and believes the patient is infected with a disease dangerous to the public health, the physician must send written notice to the local board of health of the town in which the patient resides. G.L. c. 111, § 111. Upon receipt of such a notification, the board must then send a copy of the notice to the board of health in the town in which the patient contracted the

disease, and to the board of health of each town in which the patient has exposed anyone to the disease. *Id.* Failure of a physician to satisfy this obligation will result in a fine of $50 to $200. *Id.*

103.   First responders must report unprotected exposure capable of transmitting infectious disease. G.L. c. 111, § 111C.

104.   If the DPH declares a disease dangerous to the public health, local boards of health must give notice to DPH of any person's name and location of people afflicted with the disease. G.L. c. 111, § 112. Local boards of health must keep records regarding the names and locations of all people infected. G.L. c. 111, § 113.

105.   And the foregoing says nothing of the regulations promulgated by the DPH pursuant to the authority delegated to it by the Public Health Act, set forth in Chapter 300.00 of Title 105 of the Code of Massachusetts Regulations:

> The purpose of 105 CMR 300.000 is to list diseases dangerous to the public health as designated by the Department of Public Health and *to establish reporting, surveillance, isolation and quarantine requirements.* 105 CMR 300.000 is intended for application by local boards of health, hospitals, laboratories, physicians and other health care workers, veterinarians, education officials, recreational program health service providers, food industry officials, and the public. Code of Mass. Regs., 105 CMR 300.001 (emphasis added).

106.   For instance, DPH regulations promulgated pursuant to the Act—*at least 16 years prior to COVID-19*—address mitigation of "novel coronavirus," by name. *See, e.g.*, Code of Mass. Regs., 100 CMR 300.100 ("Cases or suspect cases

of the diseases listed as follows shall be reported [to local boards of health] …

Respiratory infection thought to be due to any ***novel coronavirus***[.]") (emphasis

added) *and* 100 CMR 300.170 ("[A]ll laboratories, including those outside of

Massachusetts, performing examinations on any specimens derived from

Massachusetts residents that yield evidence of infection due to the organisms listed

below shall report such evidence of infection directly to the Department [of Public

Health] … ***Novel coronaviruses*** causing severe disease[.]") (emphasis added).

107.   Through the Public Health Act, the Massachusetts Legislature

delegated limited authority to the executive branch for infectious disease control

and mitigation. It did not delegate any infectious disease control and mitigation

authority in the Civil Defense Act. The Public Health Act predates the Civil

Defense Act, in one form or another, the by almost ***45 years***. *See* Acts of 1907, c.

183, § 1 (requiring the state board of health to define what diseases are "dangerous

to the public health"). Indeed, the Public Health Act's section "Definitions" (G.L.

c. 111, § 1) alone has been amended 11 times since first appearing as its own

section in the Act in 1938— nine of those amendments coming after enactment of

the Civil Defense Act. This all encompassing statute provides for many resources

and powers for the DPH and local health boards to access to combat and control

infectious diseases. There was no lawful authority or need for the Governor to

invoke the Civil Defense Act of 1950 on March 10, 2020.

108.   The Civil Defense Act, invoked to mitigate the spread of COVID-19 to protect the health and welfare of the people of Massachusetts, was enacted during the Cold War following World War II and immediately in the aftermath of the Soviet Union's detonation of its first atomic device in late August, 1949. It was in this geopolitical climate that the Massachusetts Legislature passed this Act, which was clearly in response to this national security threat.[72] (See Exhibit 1-Copy of Chapter 639 of the Acts of 1950. Codified as Title III, Chapter S31, Spec. L. §§ 1-22. )

109.   Section 1 of the Act, again, is very specific in its definition of "Civil Defense". It applies to all emergency civil functions other than which the military would be primarily responsible for, excluding the National Guard, for the express purpose of minimizing and repairing injury and damage resulting from disasters caused by attack, sabotage or other hostile action; or by riot or other civil disturbance; or by fire, flood, earthquake, or other natural causes. A review of the functions to be performed by the state are without question related to military attacks or other issues related thereto, as well as physical destruction to the land and injuries to the people, including radiological chemical and biological attacks. A reasonable reading of the statute giving its words their ordinary, plain and usual meaning cannot reasonably lead one to believe that one of the purposes for its use

---

[72] See Copy of Chapter 639 of the Acts of 1950. Codified as Title III, Chapter S31, Spec. L. §§ 1-22, Attached as Exhibit 1.

is to contain, as much as possible, a virus which is clearly a health matter and cannot and does not fit within the meaning of the statute's express purposes. The invocation of this Act by Governor Baker for this public health matter is without precedence.

110.   The Act has been invoked many times since 1950 and it always has been used for only extreme weather related events, excluding one instance prior to March 10, 2020, which occurred in September, 2018, for the natural gas explosions which occurred in the greater Lawrence, MA area. All of these previous invocations clearly can be said to have dealt with the avowed purposes of the Act as they all involved physical destruction, catastrophes, and injuries to life and property, both real and personal. These declarations of a state of emergency clearly fit within the meaning and purpose of the statute's catch-all phrase of "*natural causes*". (emphasis added).

111.      It is a stretch of the imagination to believe the legislature had a virus in mind when enacting this very powerful delegation of legislative authority to the executive branch of government. It is clear this Act was only to be used when necessary and only when the criteria listed for its invocation was readily apparent. It cannot be said that a virus of unknown origin with a low fatality rate was contemplated by the drafters of the Act and their fellow members in the legislature.

112.      As of June 13, 2020, the average age of death associated with COVID-19 is 81 years old in Massachusetts. People with significant underlying conditions accounted for 98.3% of total Massachusetts deaths from COVID-19.[73] The CDC estimates the COVID-19 Infection Fatality Rate to be below 0.3-0.4%.[74]

113.      Well before 1950, the Commonwealth of Massachusetts had enacted a statute that expressly dealt with matters involving the regulation and reporting of infectious diseases dangerous to public health and when and under what circumstances a quarantine and isolation of individuals could occur. (See M.G.L. c. 111, § 1 et seq.).

M.G.L. c. 111 empowers the government to forcibly quarantine the sick and infected, to prohibit travel within the state of anyone entering from an infected out-of-state area, and to report to the Department of Public Health ("DPH") the names and locations of the sick and infected. Pursuant to the authority delegated to the Department of Public Health by this statute, the DPH has promulgated infectious disease control regulations "to establish reporting, surveillance, isolation and quarantine requirements." (See 105 CMR 172.000 and 105 CMR 300.00).

114.      The DPH adopted an Infectious Disease Emergency Response Plan approximately two weeks before the declaration of the State of Emergency on

---

[73] https://www.mass.gov/doc/covid-19-dashboard-june-13-2020/download.
[74] https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html

March 10, 2020, pursuant to Chapter 111 of the General Laws. (See Mass. Dept. of Public Health, Infectious Disease Emergency Response Plan (Feb. 24, 2020).

115.   Corona viruses have long been known in the scientific and medical communities, first appearing in the Code of Massachusetts Regulations more than fifteen years ago. (See, e.g., 105 CMR 300.100 requiring reporting of the novel coronavirus to local boards of health and 105 CMR 300.170 requiring laboratories to report the novel coronavirus test results to the DPH).

116.   Relying on assumed authority, Governor Baker invoked the powerful Civil Defense Act, drafted for war-like or sudden disaster like conditions, for a public health matter.   Under the Act's express terms and provisions, it is not applicable authority. The triggering mechanism, § 5, empowers the Governor with a plethora of unbridled police powers, which are meant to deal with the specific events enumerated in §§ 1 and 5 of the Act. No previous governor has ever wielded this awesome police power in a declared state of emergency without the environment and real and personal property located within the Commonwealth being substantially affected by the event or events triggering said emergency.   This is unprecedented and must be enjoined. It is clear this Act was enacted for limited and specific matters described therein and related thereto.

117.   Because Governor Baker is proceeding under the wrong legal authority. His broad Orders, issued without regard to the specific health and welfare needs of individual communities, and must be declared null and void.

## Separation of Powers

118.   The Massachusetts Constitution, established in 1780, has specific and limited roles defined for the executive, judicial, and legislative branches of government. The separation of powers assures citizens a government of laws and not of men.

119.   Since the police power is a very wide and far reaching legislative power, the drafters of the Massachusetts Constitution were leery of the potential to infringe civil liberties with arbitrary and capricious decrees, or the whims and orders of individual executive officers. Thus, the Constitution of the Commonwealth of Massachusetts establishes a strict separation of governmental powers through Art. XXX of the Massachusetts Declaration of Rights, which states:

> In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: *to the end it may be a government of laws and not of men*. (emphasis added).[75]

---

[75] See Massachusetts Declaration of Rights, Art. XXX.

120.   Governor Baker's Executive Orders violate Article XX of the Massachusetts Declaration of Rights in relation to the separation of powers by exercising the police power expressly reserved to the legislative branch and its authority to regulate for the health and welfare of its citizens. The power of "suspending the laws, or the execution of the laws, is exclusively the prerogative of the legislature and never to be exercised but by the legislature, or by authority derived from it, to be exercised in such particular cases only as the legislature shall expressly provide for."[76]

121.   The General Court of the Commonwealth of Massachusetts is the legislative department of the Commonwealth. Mass. Const. c. I, § I, art. I. The General Court has, among other things, "full power and authority "from time to time, to make, ordain, and establish, all manner of wholesome and reasonable orders, laws, statutes, and ordinances, directions and instructions, either with penalties or without; so as the same be not repugnant or contrary to this constitution, as they shall judge to be for the good and welfare of this commonwealth, and for the government and ordering thereof, and of the subjects of the same, and for the necessary support and defence [*sic*] of the government thereof[.]Mass. Const. c. I, § I, art. IV.

---

[76] See Massachusetts Declaration of Rights, Art. XX.

122.   The Governor of the Commonwealth of Massachusetts is the state's "supreme executive magistrate." Mass. Const. c. II, § I, art. I. The governor's role in enacting legislation is constitutionally limited:

> No bill or resolve of the senate or house of representatives shall become a law, and have force as such, until it shall have been laid before the governor for his revisal; and if he, upon such revision, approve thereof, he shall signify his approbation by signing the same. But if he have any objection to the passing of such bill or resolve, he shall return the same, together with his objections thereto, in writing, to the senate or house of representatives, in whichsoever the same shall have originated; who shall enter the objections sent down by the governor, at large, on their records, and proceed to reconsider the said bill or resolve. The Supreme Judicial Court has explained that "[t]he core police power includes the right to *legislate* in the interest of the public health, the public safety and the public morals." *Abdow v. Attorney General*, 468 Mass. 478, 489 (2014) (quoting *Boston Elevated Ry. v. Commonwealth*, 310 Mass. 528, 552 (1942)).

123.   Article XX is clear on its face, "The power of suspending the laws, or the execution of the laws, ought never to be exercised but by the legislature, or by authority derived from it, to be exercised in such particular cases only as the legislature shall expressly provide for."

124.   The question is whether under the Act, the particular reason or reasons proffered by Governor Baker for the invocation of its extraordinary powers, can be determined, as a matter of law, to legally comply within its prescribed enumerated purposes of §§ 1 and 5, thereby complying with Article XX. The Plaintiff asserts that as a matter of law, COVID-19 does not fit within the meaning of §§ 1 and 5 of the Act, and thus Governor Baker's invocation of same under § 5 was both

unlawful under its provisions and unconstitutional under Article XX and Article XXX of the Massachusetts Declaration of Rights.

125.   It is solely the legislature which may lawfully exercise Massachusetts police power to address a serious health crisis. An administrative agency does not have the inherent authority to promulgate regulations—such authority must be lawfully conferred by the legislature. *Telles v. Commissioner of Ins.*, 410 Mass. 560, 565 (1991).

## Rights Reserved to the People and Privileges and Immunities

126.   The Ninth Amendment to the United States Constitution reads, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

127.   Rights under the Ninth Amendment are only those so basic and fundamental and so deeply rooted in our society to be truly "essential rights," and which nevertheless, cannot find direct support elsewhere in Constitution. *United States v. Choate*, 576 F.2d 165 (CA9 Cal 1978).

128.   Governor Baker's Orders affect most everyone within Massachusetts, whether they are residents of the state or not. The United States Constitution, Article IV, Section 2, guarantees that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." This clause provides citizens of each state the same natural and fundamental rights that are inherent in a

free society. *Corfield v. Coryell*, 6 F.Cas. 546 (1823). No state may deny these
fundamental rights to citizens of other states.

129. Governor Baker's Executive Orders deprive Plaintiff and all others
who venture into the Commonwealth of Massachusetts the denial of the most basic
human and fundamental rights, including, but not limited to:

a   the right to breathe unimpeded;

b   the right to control one's movements in space in relation to other consenting
   and competent adults;

c   the right to gather in groups of more than ten people, regardless of the
   location or the business or activity, or whether there are any health risks
   posed by those gatherings;

d   the right to lawfully enjoy public spaces, including beaches and outdoor
   recreational facilities and playgrounds;

e   the right to attend school;

f   the right to work at one's lawful profession;

g   the right to control the health care of their children[77] and to decide what
   medical devises they are required to wear; [78] and

h   the right to worship according to the dictates of one's conscience.

130. The right to move freely is a fundamental Constitutional right: "The
right of a citizen to travel upon the public highways and to transport his property
thereon in the ordinary course of life and business is a common right which he has
under his right to enjoy life and liberty, to acquire and possess property, and to

---

[77] Fundamental integrity of family unit has found protection in the Ninth Amendment and is subject to intrusion and
dismemberment only where "compelling" government interest arises and protecting child from harm is requisite
government interest. *In re S.*, 1978 OK 103, 581 P.2d 884 (Okla. 1978).

[78] See Order No. 31 mandating that children over 2 years old wear masks and distance themselves from others
attached as Exhibit No. 5.

pursue happiness and safety. It includes the right in so doing to use the ordinary and usual conveyances of the day."[79]

### Freedom of Religion, Freedom of Conscious, Freedom of Association, and Right to Peaceably Assemble

131.   "There is no pandemic exception" to the Constitution. *Berean Baptist Church v. Governor Roy A. Cooper, III*, No. 4:20-CV-81-D, at *2 (E.D.N.C. May 16, 2020).

132.   The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

133.   The Free Exercise Clause, incorporated or made applicable to the states through the due process clause of the Fourteenth Amendment, guarantees the Plaintiff the right to freely exercise his religion. *Hamilton v. Regents of the University of California*, 293 U.S. 245 (1934), *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

134.   The Establishment Clause prohibits excessive government entanglement with religion, including showing favoritism between non-religious and religious activities.

---

[79] *Thompson vs. Smith*, 154 S.E. 579 at 583.

135.   Article II of the Constitution of the Commonwealth of Massachusetts Declaration of Rights provides, "It is the right as well as the Duty of men in society, publicly, and at stated seasons of worship the SUPREME BEING, the Creator and preserver of the Universe. And no Subject shall be hurt, molested, or restrained, in his person, Liberty, or Estate, for worshipping GOD in the manner and season most agreeable to the Dictates of his own conscience, or for his religious profession or sentiments; provided he doth not Disturb the public peace, or obstruct others in their religious Worship."

136.   The First Amendment right to peaceably assemble is a fundamental right safeguarded by the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. *De Jonge v. State of Oregon*, 299 U.S. 353, 364-65 (1937).

137.   In *De Jonge v. State of Oregon*, an "unscientific" quarantine, based on bad information about the existence of the outbreak and the way that bubonic plague spreads, was the justification for closing some businesses and allowing others. The Supreme Court noted that quarantines are legitimate to stop the spread of disease, but not when they are "unreasonable, unjust, and oppressive," and therefore in violation of the U.S. Constitution. The discriminatory enforcement belied the government's assertion that a quarantine was needed or effective. Here, allowing Walmart, Target, grocery stores, liquor stores and convenience stores to

remain open, while closing places of worship and smaller businesses that could have operated in the same manner, discredits the government's assertion that a shelter-in-place, quarantine, or isolation was needed or even effective.

138.   Governor Baker's Executive Order No. 13 closed all "nonessential" workplaces, including churches, temples, mosques and other places of worship. Limiting the number of attendees at faith-based events, the Order authorized the imposition of civil and criminal penalties of fines and imprisonment for noncompliance.

139.   On March 31, 2020, Governor Baker issued COVID-19 Order No. 21 extending the applicability of Order No. 13 until May 4, 2020, including the prohibition of gatherings of more than ten people.

140.   On April 28, 2020, Governor Baker issued COVID-19 Order No. 30 further extending the applicability of Order No. 13 again, including the restriction of gatherings of more than ten people.

141.   On May 18, 2020, Governor Baker issued COVID-19 Order No. 33 "Implementing a Phased Reopening of Workplaces and Imposing Workplace Safety Measures to Address COVID-19."[80]

142.   In his Orders, Governor Baker provided no comprehensive reason or reasons backed by credible scientific and medical data as to why restrictions

---

[80] https://www.mass.gov/doc/may-18-2020-re-opening-massachusetts-order/download

remained on limited occupancy and for the indeterminate duration of these restrictions.

143. Secular businesses are advised to merely distance and many businesses are not subject to any reduction in maximum capacity limits.

144. Occupancy limits on in-person religious services while permitting larger gatherings for dozens of other secular businesses and activities, including the recent protests, does not serve any rational, substantial, or compelling governmental interest.

145. As demonstrated by its many exemptions and differing percentages to the occupancy limit on gatherings, the Commonwealth has alternative, less restrictive means to achieve any interest it may have in the occupancy limit of Order No. 33 upon the Plaintiff's gatherings.

146. Order No. 33 is effectively a prior restraint limiting the number of attendees that can be present at Holy Mass, a state imposed limitation without historical precedent in the Commonwealth of Massachusetts.

147. The state lacks a compelling or rational interest in limiting the number of attendees at Holy Mass when it allows for different standards for gatherings for businesses or other non-religious activities.

148. Order No. 33 on its face and as applied, is not the least restrictive means to accomplish the government's purposes served by the Order.

149.   Order No. 33 on its face and as applied, is not narrowly tailored to accomplish the government's purposes served by the Order.

150.   Order No. 33 on its face and as applied is irrational and unreasonable as it imposes unjustifiable and unreasonable restrictions on Plaintiff's constitutional right to assemble.

151.   Order No. 33 on its face and as applied, impermissibly entangles the state in church matters and gives it unconstitutional authority in its decision-making processes.

152.   Order No. 33 on its face and as applied, are under-inclusive by limiting their prohibitions to only certain entities, organizations, or businesses.

153.   Order No. 33 is a violation of Plaintiff's right to freedom of assembly and has caused, is causing and will to continue to cause Plaintiff undue hardship and irreparable injury.

154.   In the absence of declaratory and injunctive relief, the Plaintiff's right to freedom of religion and right to peaceably assemble will be irreparably harmed.

155.   The Plaintiff has no adequate remedy at law.

156.   Plaintiff regularly attends Holy Mass in the Archdiocese of Boston in the greater Peabody area.

157.   The reception of Holy Communion at Holy Mass is the most sacred event therein. Due to the mandated restrictions issued in Order No. 33, the Plaintiff

faces the real and substantial possibility of being prevented from attending Mass each Sunday due to state imposed occupancy limits and the Church's new limited and modified schedule of the dates and times for Holy Mass to be offered as well his inability to attend these new services due to his schedule.

158.   This has never occurred before in the Plaintiff's lifetime. The inability to receive his Lord due to circumstances and limitations imposed by Governor Baker's Executive Order No. 33 has caused Plaintiff great anxiety and undue distress.

159.   Plaintiff is a lifelong Catholic, a devout and sincere believer in the long history and traditions of the Catholic Church, its teachings and tenets, the Magisterium, and the Catholic Catechism.

160.   Plaintiff sincerely believes that in times of trouble and crisis, both personal and societal, the exercise of his faith by attending Holy Mass is indispensable.

161.   In addition to attendance at weekly Holy Mass, Plaintiff also occasionally attends Holy Mass on weekdays; other times he came to church to receive the Sacrament of Penance and the Sacrament of Holy Communion.

162.   Plaintiff, as well as other parishioners, devoutly believes that weekly attendance at Holy Mass and on many other holy days of obligation to attend Holy Mass are vital and critical tenets of the faith and that failure to satisfy these solemn

obligations are mortal sins in violation of God's commands, as enunciated by the Catholic Church's teachings through its Magisterium, which relies chiefly upon Holy Scripture, Church tradition and divine revelation for its beliefs and guidance.

163. The Catholic Church is unequivocal in its teachings and belief that the reception of Holy Communion at Holy Mass is essential to obtaining one's eternal salvation and that the wafer is not merely symbolic of Jesus Christ's body, but through a mystical process called "transubstantiation", is actually the body, blood, soul and divinity of Jesus.

164. Frequent reception of Holy Communion is strongly encouraged by the Catholic Church to help keep its parishioners in a state of grace and to assist its followers in their daily struggle to avoid sin.

165. Being part of the Catholic Church includes access to fellowship opportunities and allied services such as Alcoholic Anonymous meetings, which are often held in church basements.

166. Without access to the Church's allied services, Plaintiff has suffered and continues to suffer irreparable harm.

167. Attendance limits, distance restrictions, and the required wearing of masks or face coverings have now been placed upon the Catholic Church to reopen. A limited maximum of forty percent of its permitted occupancy level and the proviso that no one may sit closer than six feet next to a fellow parishioner,

unless one is a member of the same household, are required. Communal gatherings pre-and post-services are prohibited. All attendees must wear face coverings or masks which prohibits fellowship and spiritual closeness.

168.   When Plaintiff practices his faith, it is a holistic Catholic experience. While the church, in which Holy Mass is celebrated, is inspirational and comforting, Plaintiff's closeness to God is heightened in his communion with fellow Catholics in close proximity. Whether it is a hug in greeting, a handshake in the gesture of peace, fellowship after Holy Mass, or the resonance felt in a chorus of song[81], visceral moments of communion are essential in the practice of his faith. These acts of sacred ritual and human connection are essential to being Catholic.

169.   Following the King James Bible, Plaintiff believes that the **breath is sacred**: "the LORD God formed man of the dust of the ground, and breathed into his nostrils the breath of life; and man became a living soul"[82]; and "The spirit of God hath made me, and the breath of the Almighty hath given me life"[83]; and, "where the Spirit of the Lord *is*, there *is* liberty. But we all, with **open face** beholding as in a glass the glory of the Lord, are changed into the same image from glory to glory, even as by the Spirit of the Lord".[84] (emphasis added.)

---

[81] Psalms 100:2. Serve the LORD with gladness: come before his presence with singing.
[82] King James Bible, Genesis 2:7.
[83] King James Bible, Job 33:4.
[84] King James Bible, 2 Corinthians 3:17-18.

170. A government mandate to wear a face covering is a "restraint" on Plaintiffs "Liberty" to worship "in the manner and season most agreeable to the dictates of his own conscious".[85]

171. The Governor's Orders, on their face and as applied, impermissibly burden Plaintiff's sincerely held religious beliefs.

172. The First Amendment right to peaceably assemble is a fundamental right safeguarded by the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. *De Jonge, Id.* at 364-65.

173. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. . . . Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61 (1958).

174. Order No. 33's occupancy limits on the Church's in-person religious services while permitting larger gatherings for dozens of other secular businesses

---

[85] Constitution of the Commonwealth of Massachusetts Declaration of Rights, Article II.

and activities, particularly the recent protests, does not serve any rational, substantial, or compelling governmental interest.

175. Order No. 33 is effectively a prior restraint limiting the number of attendees that can be present at Holy Mass without any historical precedent in this state.

176. The state lacks a compelling or rational interest in limiting the number of attendees at Holy Mass when it allows for different standards for gatherings for businesses or other non-religious activities.

177. Order No. 33 on its face and as applied, is not the least restrictive means to accomplish the government's purposes served by the Order.

178. Order No. 33 on its face and as applied, is not narrowly tailored to accomplish the government's purposes served by the Order.

179. Order No. 33 on its face and as applied is irrational and unreasonable as it imposes unjustifiable and unreasonable restrictions on Plaintiff's constitutional right to assemble.

180. Order No. 33 on its face and as applied, impermissibly entangles the state in church matters and gives it unconstitutional authority in its decision-making processes.

181.   Order No. 33 is a violation of Plaintiff's right to freedom of assembly and has caused, is causing and will continue to cause Plaintiff undue hardship and irreparable injury.

182.   Order No. 33 is not facially neutral nor is it generally applicable as applied.

183.   In the absence of declaratory and injunctive relief, the Plaintiff's right to freedom of religion and right to peaceably assemble will be irreparably harmed.

184.   The Plaintiff has no adequate remedy at law.


### Masks and Face Coverings

185.   In March, the World Health Organization published guidelines that recommended that healthy people do not need to wear face masks and that doing so does not protect wearers from contracting "COVI-19." "There is currently no evidence that wearing a mask (whether medical or other types) by healthy persons in the wider community setting, including universal community masking, can prevent them from infection with respiratory viruses, including Covid-19."[86] The WHO said that COVID-19 is spread by droplets not airborne transmission. The

---

[86] Advice on the use of masks in the context of COVID-19: interim guidance, 6 April 2020, https://apps.who.int/iris/bitstream/handle/10665/331693/WHO-2019-nCov-IPC_Masks-2020.3-eng.pdf?sequence=1&isAllowed=y

WHO further warned that "makeshift cloth masks" have been shown to increase the risk of infection.[87]

186.   The only published double blind controlled clinical trial that applied to masks was in an infected population. Even when masks were worn by infected individuals, there was no statistically significant effect.[88]

187.   On June 5, 2020 the WHO updated its guidelines to recommend masks with caution, listing the many potential harms and disadvantages to their use. "The likely disadvantages of the use of mask by healthy people in the general public include:

a   potential increased risk of self-contamination due to the manipulation of a face mask and subsequently touching eyes with contaminated hands;

b   potential self-contamination that can occur if non-medical masks are not changed when wet or soiled. This can create favourable conditions for microorganism to amplify;

c   potential headache and/or breathing difficulties, depending on type of mask used;

d   potential development of facial skin lesions, irritant dermatitis or worsening acne, when used frequently for long hours;

e   difficulty with communicating clearly;

f   potential discomfort;

g   a false sense of security, leading to potentially lower adherence to other critical preventive measures such as physical distancing and hand hygiene;

h   poor compliance with mask wearing, in particular by young children;

---

i   waste management issues; improper mask disposal leading to increased litter in public places, risk of contamination to street cleaners and environment hazard;

j   difficulty communicating for deaf persons who rely on lip reading;

k   disadvantages for or difficulty wearing them, especially for children, developmentally challenged persons, those with mental illness, elderly persons with cognitive impairment, those with asthma or chronic respiratory or breathing problems, those who have had facial trauma or recent oral maxillofacial surgery, and those living in hot and humid environments."[89]

188.   The United States Surgeon General Jerome Adams warned the public that wearing a mask can actually "increase a person's risk of contracting the coronavirus". Instead, he recommended that the best way to avoid illness is to wash hands and avoid touching one's face.[90]

189.   The American Medical Association released a position paper on masks on April 21, 2020: "Face masks should be used only by individuals who have symptoms of respiratory infection such as coughing, sneezing, or, in some cases, fever. Face masks should also be worn by healthcare workers, by individuals who are taking care of or are in close contact with people who have respiratory infections, or otherwise as directed by a doctor. Face masks should not be worn by healthy individuals to protect themselves from acquiring respiratory infection

---

[89] https://apps.who.int/iris/bitstream/handle/10665/332293/WHO-2019-nCov-IPC_Masks-2020.4-eng.pdf?sequence=1&isAllowed=y
[90] Fox and Friends, March 2, 2020.

because there is no evidence to suggest that face masks worn by healthy individuals are effective in preventing people from becoming ill."[91]

190.   The CDC advised in its PPE strategy for facemasks that, "Available evidence shows that (cloth masks)... may even increase the risk of infection due to moisture, liquid diffusion and retention of the virus. Penetration of particles through cloth is reported to be high." "Altogether, common fabric cloth masks are not considered protective against respiratory viruses and their use should not be encouraged."[92]

191.   Textile materials used for cloth masks can contain harmful chemicals and dyes which can irritate a person's eyes, nose, throat and lungs, or trigger an asthma attack.[93]

192.   In any other setting where masks are mandated, there are strict procedures and protocols regarding their use and disposal.

193.   The Occupational Safety and Health Administration ("OSHA") requires employers of healthcare workers to have respiratory protection in place, but it also requires proper training in the continued use, disposal, and decontamination of face masks. OSHA states that the use of masks should be limited to adults with normal lung function, specifically excluding children, those

---

[91] *Journal of the American Medical Association (JAMA); April 21, 2020 Volume 323, Number 15* https://jamanetwork.com/journals/jama/fullarticle/2762694)

[92] https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/face-masks.html

[93] https://ww2.arb.ca.gov/resources/fact-sheets/formaldehyde and https://www.gao.gov/new.items/d10875.pdf)

with underlying breathing difficulties, and those who are otherwise difficult to fit respiratory protection.[94]

194.   OSHA says that surgical masks do not protect against COVID-19.[95]

195.   OSHA defines oxygen deficient atmosphere as below 19.5% oxygen by volume.[96] Oxygen deficiency occurs when oxygen displacement from re-breathing carbon dioxide, such as occurs with wearing masks.

196.   "Effects of exposure to low oxygen concentrations can include giddiness, mental confusion, loss of judgment, loss of coordination, weakness, nausea, fainting, loss of consciousness and death. The immediate effects of low oxygen environments are due to our body's oxygen transport system. Blood absorbs oxygen from the air in our lungs to fuel the cells in our bodies. The brain is the body organ most sensitive to the lack of oxygen. Within five seconds after inhaling only a few breaths of oxygen-free gas, there is a rapid drop in the oxygen concentration of the blood. Mental failure and coma follow a few seconds later. Symptoms or warnings are generally absent, but even if present, the loss of mental competence, weakness, loss of coordination, or fainting prevents victims from helping themselves or even summoning help. Death follows in just two to four minutes... it is not unusual for the exposed person to be unaware of the symptoms. They may even experience a false sense of security and well-being. Poor physical

---

[94] https://www.osha.gov/SLTC/respiratoryprotection/guidance.html See also ee29 CFR 1910 s u b p art I.
[95] https://www.osha.gov/SLTC/covid-19/covid-19-faq.html
[96] https://www.osha.gov/SLTC/etools/shipyard/shiprepair/confinedspace/oxygendeficient.html

health and high degrees of physical exertion aggravate the symptoms of oxygen-deficient exposure."[97]

197.   A 10% carbon dioxide-enriched air challenge for healthy young adults resulted in "mask disturbance behavior" which included anxiety, increased mask touching, and partial or complete mask removal.[98]

198.   The Food and Drug Administration "Even N95 respirators do not protect against illness or death"[99]

199.   On information and belief, until the current COVID-19 situation, no state or federal authority has ever mandated healthy people to wear restrictive masks or facial coverings in public.

200.   On May 1, 2020, Governor Baker issued COVID-19 Order No. 31 "Requiring Face Coverings in Public Places Where Social Distancing is not Possible."[100]

201.   Governor Baker's Orders are not based on concrete medical or scientific bases, but on theories and assumptions that the best way to control the spread of an infectious disease requires the practicing of physical distancing and minimizing personal contact with environments where the virus may be spread. The Order makes the claim that infection can come from someone who "does not

---

[97] https://sms.asu.edu/sites/default/files/safetygram-17_o2_deficient_atmospheres.pdf
[98] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3086949/
[99] See paragraph "N95 Respirators, https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/n95-respirators-surgical-masks-and-face-masks
[100] See COVID-19 Order No. 31 Requiring Face Coverings in Public Places Where Social Distancing is not possible, attached as Exhibit 5. https://www.mass.gov/doc/may-1-2020-masks-and-face-coverings/download

exhibit symptoms of the virus."[101] These assumptions are based on speculation and theory which have been challenged and discredited;[102] yet the mandates persist.[103]

202.    This state belief is equivalent to the practice of religion and is an imposition of secular "faith" precluded by the Massachusetts and U.S. Constitution.

203.    A licensed medical doctor is the only person qualified to give medical advice and wearing a mask is considered a health intervention because it affects the function of the respiratory system.

204.    Mandating masks and face coverings poses risks of serious harm from "direct rebreathing of the virus back into the nasal passages [which] can contribute to the migration of the virus to the brain.[104] "Newer evidence suggests that in some cases the virus can enter the brain. In most instances it enters the brain by way of the olfactory nerves (smell nerves), which connect directly with the area of the brain dealing with recent memory and memory consolidation. By wearing a mask, the exhaled viruses will not be able to escape and will concentrate in the nasal passages, enter the olfactory nerves and travel into the brain."[105]

---

[101] *Id.*

[102] https://pubmed.ncbi.nlm.nih.gov/32513410/?duplicate_of=32405162.

[103] The Public Health Council of the Massachusetts Department of Public Health met on June 10, 2020 to discuss and vote on Proposed Emergency Regulation 105 CMR 316.000, *Use of Face Masks or Coverings in Response to the COVID-19 Pandemic.*

[104] Baig AM et al. Evidence of the COVID-19 virus targeting the CNS: Tissue distribution, host-virus interaction, and proposed neurotropic mechanisms. ACS Chem Neurosci 2020;11:7:995-998and Wu et al. Nervous system involvement after infection with COVID-19 and other coronaviruses. Brain Behavior, and Immunity.

[105] *Perlman S et al. Spread of a neurotropic murine coronavirus into the CNS via the trigeminal and olfactory nerves. Virology 1989;170:556-560.*

205.   Wearing a mask can cause headaches and reduce oxygen levels.[106]

206.   Indiscriminate mandates for medical devices such as masks, or therapies such as distancing, harm both the subject and those around them. Our faces are the focus of human identity and facial expressions communicate beyond words. The harm from these Orders is greater than economic or physical harm. Masks and distancing impact the ability to communicate and feel safe.[107]

207.   Seeing most people wearing masks, and knowing many who wear masks wear them against their will in order to work and to access essential goods and services, knowing that children, the elderly, and those with underlying health conditions are lowering their immunity and putting unnecessary stress on their bodies and minds, causes Plaintiff sadness and anxiety. Plaintiff no longer enjoys life the way he did prior to Governor Baker's Orders. Where once he was always sociable and outgoing, he now even dislikes going into stores. As a result of the Executive Orders, Plaintiff has suffered and continues to suffer psychological harm.

---

[106] *Ong JJY et al. Headaches associated with personal protective equipment- A cross sectional study among frontline healthcare workers during COVID-19. Headache 2020;60(5):864-877.*
[107] https://www.cugmhp.org/five-on-friday/why-a-mask-is-not-just-a-mask/?fbclid=IwAR1_h_ykyuIOzQ9WqA_u_muupA8D8UwOgvnhlwcjoIw_CReHuKSPPmy2wC4

208.   Mandating face coverings, especially when there is no proven efficacy

for their use[108] and there is no emergent need to do so, [109] exceeds Governor

Baker's authority.

209.   The Bill of Rights and the Fourteenth Amendment were designed to

limit the reach of control over fundamental personal rights. "Forcing free and

independent individuals to endorse ideas they find objectionable is always

demeaning... Even where such clothing is not expressive per se, the forced dress

still violates citizen's protected liberty interest in choosing their own attire. Forced

---

[108] For example: https://www.acpjournals.org/doi/10.7326/M20-1342; https://wwwnc.cdc.gov/eid/article/26/5/19-0994_article?fbclid=IwAR01unIJjAs0pct9mY4m7iPxehBxmt_WB-gvHJq4E-IcZr7PBXYaGlUMiyl;
https://www.citizensforfreespeech.org/blaylock_face_masks_pose_serious_risks_to_the_healthy?fbclid=IwAR1Yr OPuReVw2E8gNaRrRKNVAFP23GYzlGG7mGX3AD6q2cHqU1dLQ63C5l0;
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4420971/?fbclid=IwAR3P7j1vFs_HAFJ-DdBZelMX32fXc5k9gReqjBOQwyTLws6GFfV_XmE5zjE;
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4868614/?fbclid=IwAR0YgAO-dzhuXSxIQucHrl0dZ5xK5xFuFFPA1CStqatE5Y4I6REJG_evLOo; https://nypost.com/2020/05/06/two-boys-drop-dead-in-china-while-wearing-masks-during-gym-class/?fbclid=IwAR1yr2qBuHdF-BVxx1wd4kWS9D9NDsdQibY4VnECgxd6oAthjabX-CS7tJc; http://scielo.isciii.es/pdf/neuro/v19n2/3.pdf;
https://www.vanguardngr.com/2020/05/warning-prolonged-use-of-facemask-produces-hypoxia/?fbclid=IwAR02WtMU_p_Pc6jmuG39XpSHhS_2dU2ES4bkfX5SPhqPwNoBb6a1--z9LG0;
https://academic.oup.com/annweh/article/56/1/102/166254?fbclid=IwAR2AAbT5G3y_RTAP4ZSKJAuduqJX01q 6GA1r0KF_aNo6s1QCaJXTvmT1iFY;
https://pubmed.ncbi.nlm.nih.gov/19216002/?fbclid=IwAR2DSP3HDqNb5Sik16vKxDitG5q9zKaxRY0c3IKiMev1 hu6wTKrLEeR8Tkc; https://www.cambridge.org/core/journals/epidemiology-and-infection/article/face-masks-to-prevent-transmission-of-influenza-virus-a-systematic-review/64D368496EBDE0AFCC6639CCC9D8BC05?fbclid=IwAR05gWLEWaxbtnQZZbj3G_GCb2Flxc7KX1g KmPqMrvbADe6ZIvDCbAkcC4o; https://www.cidrap.umn.edu/news-perspective/2020/04/commentary-masks-all-covid-19-not-based-sound-data?fbclid=IwAR1yr2qBuHdF-BVxx1wd4kWS9D9NDsdQibY4VnECgxd6oAthjabX-CS7tJc; https://www.cidrap.umn.edu/news-perspective/2020/04/data-do-not-back-cloth-masks-limit-covid-19-experts-say?fbclid=IwAR1sp3Ndz4NeE4lw_ZRDZhqd75cx-a8HrZ_Hnos_QlGlJJu3fb8WY94qKk8;
https://www.acpjournals.org/doi/10.7326/M20-1342?fbclid=IwAR0nA61O9VzJV9QYLVCkG-g677r2vBAU-9jm8xiF9FzZGs7mCd87kuzA1XA;
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6599448/?fbclid=IwAR02WtMU_p_Pc6jmuG39XpSHhS_2dU2 ES4bkfX5SPhqPwNoBb6a1--z9LG0. bin-Reza F et al. The use of mask and respirators to prevent transmission of influenza: A systematic review of the scientific evidence. Resp Viruses 2012;6(4):257-67. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5779801/; https://annals.org/aim/fullarticle/2764367

[109] Fauci, Anthony. N ENGL J MED 382;13 March 26, 2020. Dr. Anthony Fauci reported in an editorial in the New England Journal of Medicine on March 26, 2020, described the consequences of SARS-COV-2 as "more akin to those of a severe seasonal influenza (which has a case fatality rate of approximately 0.1%) or a pandemic influenza (similar to those in 1957 and 1968) rather than a disease similar to SARS or MERS, which have had fatality rates of 9 to 10% and 36% respectively."

dress 'humiliates the unwilling complier, forces the exaltation of organization over

member, unit over component, and state over individual."[110]

210.   Governor Baker's Order No. 31 mandating Masks or Face Coverings

infringes on the Constitutional right to free speech. Courts consistently recognize

that a person's clothing may contain or constitute protected speech.[111]

211.   "The right in one's personal appearance is inextricably bound up with

the historically recognized right of every individual to the possession and control

of his own person."[112]

212.   The Order requires compulsory wearing of face coverings which will

necessarily inhibit, through prior restraint, all expressive conduct related to facial

adornments, and may even compel citizens to speak when they otherwise would

not.[113]

213.   Freedom of Association is unconstitutionally burdened where the state

requires an individual to support or espouse ideals or beliefs with which he or she

disagrees..[114]

214.   The Order demands adherence to a dress code. A statute or regulation

is overbroad if it "does not aim specifically at evils within the allowable area of

---

[110] See *Karr v. Schmidt* (5th Cir.1972) 460 F.2d 609, 621 (dis. opn. of Wisdom, J.).
[111] See, e.g., *Tinker v. Des Moines Indep. Cmty. Sch. Dist.* (1969) 393 U.S. 503.
[112] *Kelley v Johnson* (425 US 238, 253 (1976).
[113] *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31* (2018) 138 S. Ct. 2448, 2464.
[114] *Wooley v. Maynard.* 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977) and *Abood v. Detroit Board of Ed.,* 43
    1 U.S. 209, 97 S. Ct. 1782, 52 L. Ed. 2d 261 (1977).

[governmental] control, but ... sweeps within its ambit other activities in ordinary circumstances that constitute an exercise" of protected expression and conduct.[115]

215.   The Order impedes the ability of residents who need not, cannot, or will not wear a mask from participating in public life and being able to access essential goods and services, making the Order unconstitutionally broad.

216.   Every person has the right to breathe unabated and unencumbered by masks. Wearing masks or face coverings restricts and interferes with the ability to breathe in fresh air in a normal and healthy manner.[116] The ability to breathe in fresh air is essential, even more so now as SARS-COV-2 has been reported to attack hemoglobin in red blood cells, rendering them incapable of transporting oxygen.[117]

217.   Wearing a face mask causes one to re-breath the carbon dioxide (CO2), that the lungs are attempting to expel. This in turn reduces the immune response, and lowers the amount of oxygen exchange across the alveolar membranes:

> "Hypercapnia, the elevation of carbon dioxide (CO2) in blood and tissues, commonly occurs in severe acute and chronic respiratory diseases, and is associated with increased risk of mortality. Recent studies have shown that

---

[115] *Thornhill v. State of Alabama* (1940) 310 U.S. 88, 97.

[116] Masks decrease oxygen intake, increase toxin inhalation, impair the natural immune response, and increase the risk of illness. Russell Blaylock, M.D., "Blaylock: Face Masks Pose Serious Risks to the Healthy," *Technocracy News & Trends*, May 21, 2020, https://www.technocracy.news/blaylock-face-masks-pose-serious-risks-to-the-healthy/ "Several studies have indeed found significant problems with wearing such a mask. This can vary from headaches, to increased airway resistance, carbon dioxide accumulation, to hypoxia, all the way to serious life-threatening complications."

[117] https://chemrxiv.org/articles/COVID-19_Disease_OFR8_and_Surface_Glycoprtein_Inhibit_Heme_Metabolism_by_binding_to_Porphyrin/11938173.

hypercapnia adversely affects innate immunity, host defense, lung edema clearance and cell proliferation. Airway epithelial dysfunction is a feature of advanced lung disease....These changes in gene expression indicate the potential for hypercapnia to impact bronchial epithelial cell function in ways that may contribute to poor clinical outcomes in patients with severe acute or advanced chronic lung diseases."[118]

218.   Wearing a mask can increase the risk of infections.[119]

219.   Mandating masks or face coverings without regard to whether a person has immunity to the illness (persons who were diagnosed with the illness, healed, and who are no longer contagious) is without any health benefit, creating an undue burden on civil liberties. With COVID-19 recovery rates the CDC estimates are greater than 99%,[120] an entire class of people in Massachusetts,[121] people who have natural immunity to the illness, face additional stress, fines, and prosecution for choosing to not wear a mask that is completely useless to them or anyone else. Governor Baker's masks and distancing orders penalize and place undue burdens on the class of people who are immune to COVID-19.

220.   Because Governor Baker's orders are being made pursuant to the Civil Defense Act, which was designed to defend and react against enemies of the

---

[118] https://www.nature.com/articles/s41598-018-32008-x.pdf
[119] *Shehade H et al. Cutting edge: Hypoxia-Inducible Factor-1 negatively regulates Th1 function. J Immunol 2015;195:1372-1376; Westendorf AM et al. Hypoxia enhances immunosuppression by inhibiting CD4+ effector T cell function and promoting Treg activity. Cell Physiol Biochem 2017;41:1271-84; Sceneay J et al. Hypoxia-driven immunosuppression contributes to the premetastatic niche. Oncoimmunology 2013;2:1 e22355.*
[120] CDC Pandemic Planning Scenarios, https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.
[121] As June 12, 2020, there are 97,521 people in the Commonwealth that have been diagnosed with COVID-19 and recovered. https://www.mass.gov/doc/covid-19-dashboard-june-12-2020/download

United States and other natural causes, including civil unrest in the wake of physical catastrophes, violations of his orders are both civil and criminal.

221.   Mandating face coverings, especially with civil and criminal sanctions, increases local fears, increases social friction, and traumatizes people who cannot tolerate face coverings.[122]

222.   To Plaintiff, being forced to wear a mask is contrary to his faith and an affront to God.[123]

223.   Plaintiff believes as the Bible teaches, that the breath is a gift from God, and it is the essence of the soul, as the breath of God gave man life. To impede God's gift for no proven benefit and at great risk of harm to his body, which is the temple of the soul, is sacrilege.

224.   Governor Baker's Order 31, requiring masks or face coverings violates MGL c.214, § 1B Right to Privacy: "A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

225.   The common law right to privacy provides a remedy for the intrusion upon the seclusion of another and the unreasonable publicity given to another's

---

[122] Psychological harms of mask-wearing: Columbia University: "Many young children burst into tears or recoil when someone wearing a mask approaches. By putting on masks, we take away information that makes it especially difficult for children to recognize others and read emotional signals, which is unsettling and disconcerting." https://bit.ly/2XDaASx
[123] 2 Corinthians 3:12.

private life. Masking mandates draws attention to those not in compliance with the Order, and may create an atmosphere of distrust, sadness, isolation, and anger.

226.   By restricting access to fresh air in public, the Order is an infringement of the fundamental right to control one's own body, and interferes with one's ability to make personal health care decisions, in violation of the 5th, 9th, and 14th Amendments to the U.S. Constitution.

227.   Plaintiff believes that his immune system will protect him, whether he gets sick or not.[124] It is Plaintiff's personal healthcare choice to keep his face bare in order to obtain adequate sun exposure year round. Plaintiff does not wear a mask because natural, unimpeded breathing is his personal healthcare decision.

228.   The Supreme Court has held that competent adults have the right to personal autonomy in matters relating to their own medical care, including the right to refuse medical treatment, even life-saving medical treatment.[125]

### Due Process

229.   The Fourteenth Amendment to the United States Constitution guarantees that states cannot "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV.

---

[124] Lechtzin N. Defense Mechanisms of the Respiratory System. Merck Manuals. Kenilworth, USA, 2016. "Coughing, sneezing, nasal hairs, respiratory tract cilia, mucous producing lining cells and the phagocytic activity of alveolar macrophages provide protection against inhaled foreign bodies including fungi, bacteria and viruses. Indeed, the pathogen laden aerosols produced by everyday talking and eating would have the potential to cause significant disease if it were not for these effective respiratory tract defenses."
[125] See *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261 (1990) and *In re Brown*, 478 So.2d 1033, 1040 (Miss. 1985).

230.   "Part II, c. 1, Section 1, art. 4, of the Massachusetts Constitution, and arts. 1, 10 and 12 of its Declaration of Rights, are the provisions in our Constitution comparable to the due process clause of the Federal Constitution." *Milton Pinnick v. Carl Cleary*, 360 Mass. 1 (1971), Note 8.

231.   Article X guarantees "Each individual in society...the right to be protected by in the enjoyment of his life, Liberty and property, according to standing laws." Furthermore, "whenever the public exigencies require, that a property of any individual be appropriated to public uses, he shall receive a reasonable compensation thereof."

232.   "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

233.   Substantive due process rights concern the ability to enjoy fundamental freedoms without governmental interference. "Without doubt, [the Fourteenth Amendment] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to

the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

234.   Substantive due process is likewise protected under Article X of the Massachusetts Declaration of Rights. Under the Declaration of Rights, a state official violates procedural due process when he or she deprives a citizen of a constitutionally protected liberty or property interest and does so without a constitutionally adequate procedure. *Gillespie v. City of Northampton*, 460 Mass. 148, 153 n.12 (2011).

235.   Plaintiff has been in the Heating Ventilating Air Conditioning (HVAC) business for 25 years. He currently operates as VIP Mechanical as a sole proprietor. Plaintiff services restaurants, gyms, tanning salons and a variety of other commercial businesses. While Plaintiff's HVAC occupation may have been considered an essential business, he has lost approximately eighty percent of his HVAC income when the commercial food establishments he services were forced to close indefinitely.

236.   Since March 16, 2020, when Governor Baker issued an Order "prohibiting gatherings of more than 25 people and on-premises consumption of food or drink," he has declared which businesses or activities everywhere in the Commonwealth of Massachusetts may remain open as "essential" and which are required to close.

237.   Under Governor Baker's Executive Orders, Plaintiff had no opportunity to defend against the deprivation his liberty and property interests.

238.   Governor Baker's Orders have harmed Plaintiff's interests in his chosen profession. "Established case law clearly identifies the right to follow ones chosen profession as a constitutionally protected liberty interest." *Baillargeon v. DEA,* 638 F. Supp. 2d 235, 238 (D.R.I 2009) (citing *Greene v. McElroy,* 360 U.S. 474, 492 (1959)).

239.   "The Due process clause protects one's right to pursue a livelihood of one's choice." *Advance Am. v. FDIC,* 257 F. Supp. 3d 56, 61 (D.D.C. 2017).  The due process clause further guarantees a right to hold private employment and to pursue one's chosen profession, with the right to be free from unreasonable government interference in employment. *See Mead v. Indep. Ass'n,* 684 F. 3d 226, 232 (1st Cir. 2012) (citing *Green,* infra. 360 U.S. at 492).

240.   It makes no difference that Plaintiff was able to get a job in another field.  For example, the court noted in *Advance Am.*, "It would be of little consolation to an attorney, driven from his practice by improper government stigma, that McDonald is still hiring." *Advance Am.,* 257 F.Supp.3d at 66.

241.   Governor Baker's Orders have precluded Plaintiff from engaging in his chosen profession by closing the businesses that make up his entire customer base.

242.   Governor Baker's Orders have cost Plaintiff twenty-five years of investment in building his once thriving HVAC business.  As a direct consequence of Governor Baker's Orders requiring continuing closures and costly restrictions to businesses within the Commonwealth, Plaintiff has been denied his rights to substantive and procedural due process, causing irreparable harm to his civil liberties, professional interests and personal interests, as well as having caused financial hardship and significant economic losses.

243.   None of the non-essential businesses were provided with any notice or opportunity to challenge the Executive Orders, thereby denying Plaintiff fundamental and essential due process rights.

244.   Although the Commonwealth of Massachusetts is now undergoing a four-phased Reopening Plan, there remain significant and cumbersome restrictions limiting the opening of certain businesses, and requiring the continued closure of others.

245.   There is no rational basis posited in the state's decisions to piecemeal open up the economy. In short, the Reopening Plan belies common sense.

246.   While some businesses are now permitted by the Governor to open with substantial restrictions on them, others are left to wilt on the vine and face economic ruin, both presently and permanently.

247.   Governor Baker's Orders irrationally discriminate against one business in favor of others.  While businesses like Walmart and Target have been allowed to remain open, the smaller commercial establishments where Plaintiff performs his work were forced to close.  Governor Baker's Orders violate the equal protection clause because there is no legitimate, scientific, or rational basis to distinguish between Walmart and smaller mom and pop stores that service many less people.

248.   Governor Baker's Orders continue to arbitrarily require many businesses to remain closed. These orders have unilaterally suspended the peoples' right to engage in one's chosen profession.

249.   By invoking the Civil Defense Act, Governor Baker violated the express provisions of the Massachusetts Declaration of Rights. Governor Baker's actions have deleteriously affected Plaintiff in his business dealings in HVAC installation and repair. Due to the Orders issued by the Governor, which have effectively completely shutdown the restaurant industry, many of Plaintiff's customers closed because the restaurants offered dine-in eating only. This has caused his business to suffer irreparable harm and devastating financial losses. He has had to obtain employment outside his chosen profession and licensure due to the forced closing of his business.

250.   The United States Constitution's Fifth Amendment guarantees that private property shall not be taken for a public use without just compensation,

and was specifically "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40 (1960).

251. Taken together cumulatively, these oppressive and excessive Executive Orders have and continue to restrict, infringe upon, and deny Plaintiff his constitutional rights guaranteed by the First, Fifth, Ninth and Fourteenth Amendments to the U.S. Constitution.

252. Taken together cumulatively, these Executive Orders have and continue to restrict, infringe upon, and deny Plaintiff his constitutional rights to Freedom of Conscience as guaranteed by the Constitution of the Commonwealth of Massachusetts Declaration of Rights, Article II.

253. Taken together cumulatively, these Executive Orders have and continue to restrict, infringe upon, and deny Plaintiff his constitutional rights to Freedom of Assembly as guaranteed by the First Amendment to the United States Constitution and Article II of the Constitution of the Commonwealth of Massachusetts Declaration of Rights.

254. Taken together cumulatively, these Executive Orders have and continue to restrict, infringe upon, and deny Plaintiff his constitutional rights to freely engage in his chosen profession.

## CLAIMS

## COUNT I

**Violation of the U.S. Constitution-Fifth, Ninth and Fourteenth Amendments**

255.   Plaintiff repeats and incorporates by reference the allegations of Paragraphs 1-254 above as though fully stated herein.

256.   The Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution provide that no state shall deprive any person of due process or equal protection of the laws.

257. Governor Baker has ordered the closure of the numerous businesses, namely dine-in restaurants and allied vendors has deprived Plaintiff of his right to his chosen profession, business interests, customers, and contracts, in essence depriving Plaintiff of his property and constitutional rights.

258. The Executive Orders violate the Equal Protection Clause as there is no legitimate, scientific, compelling or rational basis to distinguish between businesses in determining which are allowed to operate and which are not.

259.   Governor Baker's Orders that compelled the closure of lawful businesses resulted in significant and irreparable harm.

260.   A justiciable controversy has arisen between Plaintiff and Defendant as to whether the aforementioned Executive Orders violate the United States Constitution's Fifth, Ninth and Fourteenth Amendments.

## COUNT II

**Violation of the First and Fourteenth Amendments to the U.S. Constitution**

261.   Plaintiff repeats and incorporates by reference the allegations of Paragraphs 1-260 above as though fully stated herein.

262.   On their face and as applied to the Plaintiff, Governor Baker's Orders violate Plaintiff's First Amendment rights. The overbroad, arbitrary, and indiscriminate application of the restrictions on Plaintiff's ability to practice his faith and to assemble with fellow parishioners are not narrowly tailored nor the least restrictive means.

263.   On its face or as applied, Governor Baker's Order No. 33 of May 18, 2020 is not neutral since it treats secular businesses more favorably than religious services and activities.

264.   The Governor's Orders, on their face and as applied, target Plaintiff's sincerely held religious beliefs by prohibiting religious gatherings based on a percentage of the occupancy limits of a parish and requiring limitations on his proximity to other parishioners.

265.   On their face and as applied, the Governor's Orders are neither neutral or generally applicable.

266.     The Commonwealth of Massachusetts lacks a compelling interest in the Governor's Orders' application of different standards for churches and religious gatherings from those applicable to exempted businesses or non-religious entities and massive protests.

267.     Even if supported by a compelling interest, the Order No. 33 of May 18, 2020 relative to houses of worship is not the least restrictive means to accomplish the government's interest herein.

268.     Governor Baker's Order of May 18, 2020, which infringes upon Plaintiff's constitutional rights, is neither narrowly tailored nor the least restrictive means to accomplish a compelling governmental interest.


## COUNT III

### Executive Power

### Chapter 639 of the Acts of 1950: Civil Defense Act; and

### Massachusetts Declaration of Rights, Articles XX and XXX


269.     Plaintiff repeats and incorporates by reference the allegations of Paragraphs 1-268 above as though fully stated herein.

270.    The Constitution of the Commonwealth of Massachusetts establishes a strict separation of governmental powers through Art. XXX of the Massachusetts Declaration of Rights.

271.    Governor Baker's Orders violate Article XX of the Massachusetts Declaration of Rights regarding the separation of powers by exercising the police power expressly reserved to the legislative branch and its authority to regulate for the health, safety, and welfare of its citizens.

272.    Article XX is clear on its face, "The power of suspending the laws, or the execution of the laws, ought never to be exercised but by the legislature, or by authority derived from it, to be exercised in such particular cases only as the legislature shall expressly provide for."

273.    The Plaintiff asserts that as a matter of law, COVID-19 does not fit within the statutory scheme and meaning of the listed events in §§ 1 and 5 of the Civil Defense Act, c. 639 of the Acts of 1950, and thus Governor Baker's invocation of same under § 5  was both unlawful and unconstitutional under its provisions and also under Article XX and Article XXX of the Massachusetts Declaration of Rights.

274.    An actual justiciable controversy exists between parties as to whether the Executive Orders violate the separation of powers as delineated in the Massachusetts Declaration of Rights.

275.    Consequently, Plaintiff is entitled to injunctive and declaratory relief enjoining and invalidating the Executive Orders.

## COUNT IV

### Equal Protection-14[th] Amendment to the U.S. Constitution

### and Massachusetts  Declaration of Rights, Article I

276.    Plaintiff repeats and incorporates by reference the allegations of Paragraphs 1-275 above as though fully stated herein.

277.    The Massachusetts Declaration of Rights, Article I, guarantees the right of equal protection to all persons.

278.    Governor Baker has ordered the limitation and closure of restaurant and food businesses, thereby crippling the restaurant industry, and putting many allied professionals out of work.

279.    Through the Reopen Advisory Board, Governor Baker's phased reopening of the Massachusetts economy is indefinite and imposes such onerous restrictions on restaurant businesses, in particular dine-in only,  that it has consequently deprived Plaintiff of the ability to conduct his business full time.

280.    The Executive Orders violate the rights of Plaintiff because there is no

legitimate, objective, scientific and/or rational basis to distinguish between businesses required to close or to remain closed or to limit any lawful businesses from full operation. The closure of restaurants and allied businesses has caused Plaintiff irreparable injury.

281.    An actual justiciable controversy exists between the parties as to whether the Executive Orders violate the Massachusetts Declaration of Rights.

282.    Consequently, Plaintiff is entitled to injunctive and declaratory relief enjoining and invalidating the Executive Orders for closure and phased re-opening of businesses and places of worship.

## COUNT V

**First, Fifth, Ninth and Fourteenth Amendments to the U.S.
and the Constitution of the Commonwealth of Massachusetts,
Declaration of Rights, Articles I, IV, X and XII-Due Process**

283.    Plaintiff repeats and incorporates by reference the allegations of Paragraphs 1-290 above as if fully stated herein.

284.    "Part II, c. 1, Section 1, art. 4, of the Massachusetts Constitution, and arts. 1, 10 and 12 of its Declaration of Rights, are the provisions in our Constitution comparable to the due process clause of the Federal Constitution." *Milton Pinnick V. Carl Cleary*, 360 Mass. 1 (1971), Note 8.

285.    Governor Baker's Orders deprive Plaintiff and other citizens of their

privileges and liberty because the Orders prevent them from choosing whether or not to wear a face mask or covering.

286.     Accordingly, Executive Order No. 31 and No. 33 both violate Plaintiff's right to procedural due process under the U.S. Constitution and the Constitution of the Commonwealth of Massachusetts.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vincent Delaney, respectfully requests the Court to enter the following Orders and Judgment against Defendant as follows:

1. Granting the Plaintiff's concurrently filed Emergency Motion For A Temporary Restraining Order and preliminary and permanent injunctive relief thereafter;

2. Declaratory Judgment that the Civil Defense Act does not enable Governor Baker to apply its provisions during a public health situation which has not occurred as a result of the specific acts or destruction defined by said Act;

3. Declaratory Judgment that the invocation of the Act on March 10, 2020 was both unlawful and unconstitutional and all Orders issued pursuant thereto are null and void;

4. Declaring enforcement of Order Nos. 31 and 33 against Plaintiff and

those affected by same to be unlawful and/or a violation of the Plaintiff's constitutional and statutory rights;

     5.  Grant preliminary injunctive relief and thereafter permanent injunctive relief enjoining the Defendant and those in concert or active participation with him from enforcing Executive Order No. 591 and all subsequent Orders issued pursuant thereto against the Plaintiff and those similarly situated;

     6.  Entry of judgment for the Plaintiff against the Defendant for deprivation of his constitutional rights, including damages, in an amount to be determined by the Court;

     7.  Award the Plaintiff attorneys' fees and costs as authorized by Fed. R. Civ. P. 54, 42 U.S.C. §1988, and/or any other applicable law; and

     8.  Award such other relief as this Court deems fair and equitable.

Respectfully submitted,

Vincent Delaney,

By his attorney,

/s/ Thomas O. Mason
Thomas O. Mason (BBO# 559263)
Law Office of Thomas O. Mason
19 Wells Place
Lynn, MA 01902
Telephone: 781-599-2689
Email: tm715@aol.com

Date: June 17, 2020

*Counsel for Plaintiff*

## VERIFICATION

I, Vincent Delaney, am over eighteen years old and I am the Plaintiff

in this action. The statements and allegations that pertain to me or which I make in

this Verified Complaint for Declaratory Judgment and Injunctive Relief have been

examined and are true and correct and based upon my personal knowledge, unless

otherwise stated. If called upon to testify to their truthfulness, I would and could do

so competently. I declare under penalty of perjury, under the laws of the United

States and the Commonwealth of Massachusetts, that the foregoing statements are

true and correct to the best of my knowledge, information and belief.


Dated:  June 17, 2020

Vincent Delaney