UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
VINCENT DELANEY,                )
                                )
            Plaintiff,          )
                                )
        v.                      )        CIVIL ACTION
                                )        NO. 20-11154-WGY
CHARLES D. BAKER,               )
In his offical capacity as      )
Governor of the Commonwealth    )
of Massachusetts,               )
                                )
            Defendant.          )
_____)

YOUNG, D.J.                                    January 6, 2021

**FINDINGS OF FACT, RULINGS OF
LAW, AND ORDER FOR JUDGMENT**

## I.    INTRODUCTION

On June 18, 2020, Vincent Delaney ("Delaney"), a resident

of Peabody, Massachusetts, filed suit against Charles D. Baker

("Governor Baker") in his official capacity as the Governor of

the Commonwealth of Massachusetts for executive orders issued in

a state of emergency pertaining to COVID-19, a novel

coronavirus.  Compl. ¶¶ 1-5, ECF No. 1.  Delaney alleged five

counts against Governor Baker: violation of the Due Process and

Equal Protection Clauses of the Fifth, Ninth, and Fourteenth

Amendments of the U.S. Constitution for alleged harm to

Delaney's pecuniary and professional interests ("Count I"),

violation of the free exercise clause of the First Amendment of

the U.S. Constitution ("Count II"),[1] violation of Massachusetts General Laws Chapter 639 of the Acts of 1950, the Civil Defense Act, and Articles XX and XXX of the Massachusetts Declaration of Rights ("Count III"), violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Article I of the Massachusetts Declaration of Rights ("Count IV"), and violation of the First, Fifth, Ninth, and Fourteenth Amendments to the U.S. Constitution and Articles I, IV, X, and XII of the Massachusetts Declaration of Rights ("Count V").  Id. ¶¶ 255-286.

On July 31, 2020, Delaney filed a motion for a preliminary injunction and, pursuant to Rule 41(a) of the Federal Rules of Civil Procedure, moved to dismiss Count III entirely and Counts IV and V partially insofar as those counts raised matters of state law.  Pl.'s Mot. Prelim. Inj. 1-2, ECF No. 13; Pl.'s Mem. Supp. Pl.'s Mot. Prelim. Inj. ("Pl.'s Mem."), ECF No. 14; Pl.'s Stipulation Dismissal 1, ECF No. 15.

---

[1] Delaney also claims that Governor Baker infringed upon the Establishment Clause and his First Amendment right of peaceable assembly.  See Pl.'s Mem. Opp'n Mot. Dismiss & Reply Def.'s Opp'n Mot. Prelim. Inj. 10-14 ("Pl.'s Opp'n Mem."), ECF No. 22. On the same grounds that Delaney lacks standing to challenge the orders under the Free Exercise Clause, Delaney lacks standing to challenge the orders under the Assembly Clause, see infra Part III.A.2. (lack of concrete and particularized injury) and Establishment Clause, see infra Part III.A.3. (lack of redressability).

Governor Baker opposed the preliminary injunction and moved to dismiss the complaint on four grounds: (1) Delaney lacked standing to challenge Governor Baker's actions, (2) notwithstanding Delaney's lack of standing, Delaney failed to establish a likelihood of success on the merits of his challenges, (3) Delaney failed to demonstrate irreparable harm, and (4) the balance of hardships and the public interest strongly favored upholding Governor Baker's orders.  Mot. Dismiss, ECF No. 18; Def.'s Mem. Supp. Mot. Dismiss. & Opp'n Mot. Prelim. Inj. ("Def.'s Mem.") 10-30, ECF No. 19.  Delaney filed an opposition to Governor Baker's motion to dismiss. Pl.'s Opp'n Mot. Dismiss, ECF No. 21; Pl.'s Mem. Opp'n Mot. Dismiss & Reply Def.'s Opp'n Mot. Prelim. Inj. ("Pl.'s Opp'n Mem."), ECF No. 22.

On September 2, 2020, after hearing argument of counsel by video conference, this Court granted Governor Baker's motion to dismiss as to Counts I, IV, and V.  Elec. Clerk's Notes (Sept. 2, 2020), ECF No. 23.  This Court also collapsed the motion for preliminary injunction with trial on the merits in accordance with Rule 65(a) of the Federal Rules of Civil Procedure and set a bench trial for October 2, 2020.  Id.  On October 1, 2020, Delaney and Governor Baker jointly filed stipulated findings of fact.  Joint Proposed Finding Fact ("Joint Finding"), ECF No. 24.  On October 5, 2020, the Court held a remote hearing on

[3]

Count II, and, after hearing argument of counsel, took the matter under advisement.  Elec. Clerk's Notes (Oct. 5, 2020), ECF No. 25.

On December 10, 2020, the Massachusetts Supreme Judicial Court held that Governor Baker's declaration of an emergency arising from the COVID-19 pandemic, and his issuance of orders pursuant to that declaration, are authorized under Massachusetts's Civil Defense Act, that the emergency orders do not violate the principle of separation of powers in Article 30 of the Massachusetts Declaration of Rights, and that the emergency orders do not violate the plaintiffs' federal[2] or state constitutional rights to procedural and substantive due process or free assembly.  <u>Desrosiers</u> v. <u>Governor</u>, 486 Mass. 369 (2020).

After considering the record and parties' arguments, this Court rules in favor of Governor Baker.

## II.  FINDINGS OF FACT

The parties filed a joint finding of fact for trial on the merits.  <u>See generally</u> Joint Finding.  The joint finding, as stipulated by the parties, is substantially reproduced below and

---

[2] The Supreme Judicial Court is, of course, the final word on matters of state law (none of which are present here). Delaney, however, is not bound by its federal law rulings in a case to which he was not a party.  He is entitled to this Court's independent adjudication in this separate opinion.

supplemented by Governor Baker's subsequent executive orders and evidence subject to judicial notice.[3]

### A. Governor Baker's Orders Governing Gatherings and Occupancy Limits

On March 10, 2020, Governor Baker declared a state of emergency for the Commonwealth of Massachusetts, and Massachusetts remains in a state of emergency to date.  Joint Finding ¶ 1.  In connection with the state of emergency, Governor Baker issued a series of executive orders.  Id. ¶ 2. On March 23, 2020, Governor Baker issued Order 13, which prohibited gatherings of ten or more persons in any confined indoor or outdoor space throughout Massachusetts.  Id. ¶ 3. Order 13 enumerated a list of "essential services" to combat the pandemic and temporarily closed the brick-and-mortar premises of all "non-essential businesses."  COVID-19 Order No. 13, Order Assuring Continued Operation of Essential Services in the Commonwealth, Closing Certain Workplaces, and Prohibiting Gatherings of More Than 10 People (Mar. 23, 2020), Ex. A.  The ten-person limitation did not apply to businesses identified in the Order as "essential services," which could continue operation under social distancing and occupancy guidelines issued by the Commissioner of Public Heath on March 25, 2020.

---

[3] A list of Governor Baker's orders can be found at COVID-19 State of Emergency, mass.gov, https://www.mass.gov/info-details/covid-19-state-of-emergency (last visited Jan. 5, 2021).

Id. § 1.  Order 13 did not close "[c]hurches, temples, mosques, and other places of worship," which could continue operation subject to the ten-person limit, id. §§ 2-3, and the Order allowed gatherings in excess of ten persons in "unenclosed, outdoor space," such as parks, athletic fields, and parking lots, id. § 3.

On May 18, 2020, Governor Baker issued Order 33, which modified Order 13 and introduced a "phased" reopening of entities restricted by Order 13.  Joint Finding ¶ 5.  This order relieved places of worship and other "Phase I" entities from Order 13's ten-person limitation on gathering.  Id.  Order 33 required these entities to comply with general workplace safety protocols outlined in Order 33, including but not limited to social distancing of at least six feet, hygiene protocols, and cleaning protocols.  Id.  Order 33 noted the "recent public health data indicat[ing] improvement in key areas of measurement" and that this

> improving public health data permits a carefully
> phased relaxation of certain restrictions that COVID-
> 19 Order No. 13 has placed on businesses and other
> organizations, provided that any adjustment can only
> be maintained or expanded on the basis of continuing
> improvements in the public health data, and further
> provided that any adjustment must reflect the reality
> that the Commonwealth remains in the midst of a public
> health emergency, as demonstrated by reporting from
> the Department of Public Health that as of May 17,
> 2020, 2,597 persons remained hospitalized in the
> Commonwealth as a result of COVID-19 and 702 of these

patients are receiving treatment in intensive care
units.

Joint Finding, Ex. B, COVID-19 Order No. 33, Order Implementing
a Phased Reopening of Workplaces and Imposing Workplace Safety
Measures to Address COVID-19 at 2 (May 18, 2020), ECF No. 24-2.
Order 33 remains in effect.  Joint Finding ¶ 5.

Contemporaneous with Order 33, the Director of Labor
Standards issued workplace standards for places of worship on
May 18, 2020.  Joint Finding, Ex. C, Sector-Specific Workplace
Standards for Places of Worship and Religious Services (May 18,
2020) ("May 18th Rules"), ECF No. 24-3.  The May 18th Rules
encouraged, but did not require, places of worship to hold
services virtually or outdoors and, when holding services
outdoors, to ensure that attendees who are not from the same
immediate household are spaced at least six feet apart.  Id. at
1.  These rules also encouraged places of worship holding
services indoors to place tape or other visual distancing
markings on seating to delineate six-foot separations, to post
signage indicating the maximum number of persons permitted per
row, to accommodate orderly entering and exiting of services in
a manner that complies with social distancing, and to modify the
means of collecting financial contributions and communal rituals
to minimize contact.  Id. at 2-3.

The May 18th Rules required places of worship to institute the following safety measures: an occupancy limit of forty percent of the building's maximum capacity for services held indoors, a social-distancing requirement of six feet between attendees who are not part of the same immediate household, a requirement that all attendees must wear a mask, a prohibition on non-religious pre- or post-service communal gatherings, and disinfection and notification protocols.  Id. at 1-3.

On July 6, 2020, the Director of Labor Standards issued new rules for places of worship and religious services, substantially reiterating the May 18th Rules, with the notable exception that the new rules increased the occupancy limit from forty to fifty percent of the building's maximum capacity. Joint Finding, Ex. C, Sector Specific Workplace Standards for Places of Worship and Religious Services to Address COVID-19 at 1-4 (July 6, 2020) ("July 6th Rules"), ECF No. 24-3.

Pursuant to Orders 35 and 37, general retail stores, which beginning on June 8, 2020 could reopen their physical premises in Phase II, were subject to a forty percent occupancy limit. COVID-19 Order No. 35, Order Clarifying the Progression of the Commonwealth's Phased Workplace Re-Opening Plan and Authorizing Certain Re-Opening Preparations at Phase II Workplaces (June 1, 2020); COVID-19 Order No. 37, Order Authorizing the Re-Opening of Phase II Enterprises (June 6, 2020); Joint Finding ¶ 7.  That

limit was increased to fifty percent in revised sector-specific standards issued on July 10, 2020.  Joint Finding ¶ 7.

Several later orders also addressed the size of gatherings, including Order 38, issued on June 6, 2020 which restated the ten-person limitation on gatherings in any confined indoor or outdoor space.  Id. ¶ 8.  This limitation did not apply to any Phase I or II entities and thus did not apply to places of worship.  Id.  Order 38 prohibited outdoor events that "gather large numbers [of] participants or spectators," but permitted "outdoor gatherings for the purpose of political expression . . . ."  Id. (quoting Joint Finding, Ex. D, COVID-19 Order No. 38, Revised Order Regulating Gatherings Throughout the Commonwealth at 3 (June 6, 2020), ECF No. 24-4).  On July 2, 2020, Governor Baker issued Order 44, which increased the limit for gatherings to a new maximum of twenty-five persons in any confined indoor space and 100 persons for enclosed outdoor spaces.  Joint Finding, Ex. E, COVID-19 Order No. 44, Second Revised Order Regulating Gatherings Throughout the Commonwealth at 2-3 (July 2, 2020), ECF No. 24-5; Joint Finding ¶ 9.  These limitations did not apply to any Phase I, II, or III entity, including places of worship.  Joint Finding ¶ 9.  Order 44 continued Order 38's prohibition on outdoor gatherings for purposes other than political expression.  Id.

Thereafter, on August 7, 2020, Governor Baker issued Order 46, which maintained the twenty-five-person limitation for gatherings in enclosed indoor spaces but reduced the limitation for outdoor gatherings to fifty persons.  Id. ¶ 10.  These limitations on gathering size did not apply to any Phase I, II, or III entity, including places of worship.  Id.  Order 46 further stated that "[o]utdoor gatherings for the purpose of political expression and gatherings for religious activities shall not be subject to" the above limitations, "provided, however, that indoor gatherings for the purposes of political expression shall be governed by the indoor limitations" of Order 46.  Id. (quoting Joint Finding, Ex. F, COVID-19 Order No. 46, Third Revised Order Regulating Gatherings Throughout the Commonwealth at 3 (Aug. 7, 2020), ECF No. 24-6).

On September 29, 2020, Governor Baker issued Order 52, which maintained the twenty-five-person limitation for gatherings in enclosed indoor spaces.  Joint Finding, Ex. G, COVID-19 Order No. 52, Phase III, Step 2 Order Regulating Gatherings in the Commonwealth (Sept. 29, 2020), ECF No. 24-7. Order 52 section 3(d) provided that outdoor gatherings in settings open to the public and at event venues, clubs, parks, and other outdoor spaces (public or private) regularly used or available for gatherings through lease, license, permit, reservation, or similar arrangement are limited to 100 persons

if the venue is located in "Lower Risk Communities," defined in
Order 51 as communities with low incidence of COVID-19, as
measured by the Department of Public Health in accordance with
the health metrics further specified in Order 51.  Joint Finding
¶ 11.  In communities that did not qualify as Lower Risk
Communities, gatherings at the foregoing venues were limited to
fifty persons.  Id.  Outdoor gatherings at private residences,
in private backyards, and other outside venues not listed were
limited to fifty persons regardless whether they occurred in
Lower Risk Communities or communities that did not qualify as
Lower Risk Communities.  Id.

Order 52's limitation on gathering size did not apply to
indoor religious activities, which instead remained subject to
the fifty percent occupancy limitation set forth in the
applicable sector-specific standards governing places of
worship.  Id.  Outdoor religious gatherings, therefore, were not
subject to any size limitation.  Id.  Indoor gatherings for the
purpose of political expression were subject to Order 52's
twenty-five-person limitation, while outdoor gatherings for
political expression were not subject to Order 52's limitation
on outdoor gatherings.  Id.

On November 2, 2020, Governor Baker issued Order 54,
reducing the gathering-size limit in private residences to ten
persons indoors and twenty-five persons outdoors.  Def.'s Notice

Suppl. Authority (Nov. 10, 2020), Ex. A, COVID-19 Order No. 54, Revised Order Further Regulating Gatherings in the Commonwealth § 3(b)-(c) (Nov. 2, 2020), ECF No. 26-1.  The limits on gatherings in public spaces and at event venues remained the same, but the Order required that "[a]ll gatherings, no matter the size or location, must end and participants must disperse by 9:30 pm, with the exceptions of religious gatherings and political gatherings."  Id. § 4.

On December 8, 2020, Governor Baker issued Order 57. Def.'s Notice Suppl. Authority (Dec. 14, 2020), Ex. A, COVID-19 Order No. 57, Further Revised Order Regulating Gatherings in the Commonwealth (Dec. 8, 2020), ECF No. 29-1.  Order 57 reduces to fifty the number of people allowed at outdoor gatherings, event venues, and in public settings, while exempting places of worship from this limit.  Id. at 3-5.  On the same day, Governor Baker also issued Order 58.  Def's Notice Suppl. Authority (Dec. 14, 2020), Ex. B, COVID-19 Order No. 58, Order Returning All Municipalities to Phase III, Step 1 COVID-19 Safety Rules (Dec. 8, 2020), ECF No. 29-2.  Updated sector-specific standards reduced the occupancy limits for places of worship, restaurants, grocery stores, and other retail stores from fifty to forty percent.  See Def.'s Notice Suppl. Authority (Dec. 14, 2020), Ex. C, Sector Specific Workplace Standards for Places of Worship and Religious Services to Address COVID-19 ("December 11th

Rules") (Dec. 11, 2020), ECF No. 29-3; Def.'s Notice Suppl.
Authority (Dec. 14, 2020), Ex. C, Sector Specific Workplace
Safety Standards of Retail Businesses to Address COVID-19 (Dec.
11, 2020), ECF No. 29-3; Def.'s Notice Suppl. Authority (Dec.
14, 2020), Ex. C, Sector Specific Workplace Safety Standards for
Restaurants to Address COVID-19 (Dec. 11, 2020), ECF No. 29-3.

On December 22, 2020, Governor Baker issued Order 59.
Def.'s Notice Suppl. Authority (Dec. 24, 2020), Ex. A, COVID-19
Order No. 59, Order Temporarily Applying Further Capacity
Restrictions to Statewide COVID-19 Safety Rules (Dec. 22, 2020),
ECF No. 30-1.  Order 59 became effective on December 26, 2020
and remains in effect until January 10, 2021 unless further
extended.  Id. at 5.  Order 59 reduces the limitations on
gatherings set forth in Order 57 and the occupancy limitations
set forth in Order 58's sector-specific standards.  Id. at 3.
With respect to gatherings, the Order reduces the public and
private outdoor limitation to twenty-five persons and the public
and private indoor limitation to ten persons.  Id.  With respect
to occupancy, the Order reduces the occupancy limit from forty
percent to twenty-five percent for retail businesses, offices,
restaurants, close contact personal services, theaters and
performance venues, fitness centers, and places of worship.  Id.
at 3-4.  Order 59 excludes workers and staff from the occupancy

count for retail businesses, restaurants, close contact personal
services, places of worship, and indoor and outdoor events.  Id.

### B.   Governor Baker's Orders Governing Social Distancing and Hygiene Measures

Under both the initial and subsequent sector-specific
standards applicable to places of worship, attendees at indoor
and outdoor religious services who are not part of the same
immediate household must be seated at least six feet apart, but
members of the same immediate household are permitted to sit
together (i.e., less than six feet apart).  Joint Finding ¶ 12.

Restaurants, which were designated as Phase II entities,
initially could provide outdoor dining beginning in Phase II,
Step 1 (on June 8, 2020), and thereafter could provide indoor
dining in Phase II, Step 2 (on June 22, 2020).  Id. ¶ 14.  Under
prior sector-specific standards, restaurants, although not
subject to numerical or percentage-based occupancy limits when
operating as restaurants, were limited in the number of people
they may accommodate by virtue of the six-foot-distance
requirement between indoor tables unless divided by nonporous
barriers that are at least six-feet high.  Id.  The standards
initially allowed up to six persons to sit at indoor tables, and
as of September 28, 2020, updated standards allowed up to ten
persons to sit at indoor tables.  Id.  Order 59 imposed a
twenty-five percent occupancy limit on restaurants and close

contact personal services.  Def.'s Notice Suppl. Authority (Dec.
24, 2020), Ex. A, COVID-19 Order No. 59 at 3-4.

Social distancing was not required for political protestors
who attended outdoor protests, but under Order 46 (effective
August 11, 2020), persons from unrelated households attending an
indoor gathering for purposes of political expression were
subject to the six-foot social distancing requirement set forth
in Order 46, as reiterated in Order 52.  Joint Finding ¶ 15.

C.   **Governor Baker's Orders Governing Face Coverings**

On May 1, 2020, Governor Baker issued Order 31, which
provides that any person over the age of two who is in an indoor
or outdoor place open to the public and is unable to maintain a
six-foot distance from every other person must wear a mask or
cloth face covering except where unable to do so because of a
medical condition or where the person is otherwise exempted by
Department of Public Health guidance.  Id. ¶ 16.  Any person who
declines to wear a mask or cloth face covering because of a
medical condition is not required to produce documentation
verifying the condition.  Id.  Order 31 also requires all
persons to wear a mask or cloth face covering at all times,
regardless whether they can maintain a six-foot distance from
other persons, when inside grocery stores, pharmacies, and other
retail stores, as well as when providing or using mass public
transit, taxi, ride-sharing, or other similar services.  Id.

On August 7, 2020, Governor Baker issued Order 46, requiring all participants not from the same household over the age of two to wear face coverings unless unable to do so due to a medical or disabling condition during both indoor and outdoor gatherings of more than ten persons. Id. ¶ 17. The requirement applied to "all venues and locations," including private homes and backyards, parks, athletic fields, and parking lots, and regardless whether the participants were able to maintain a six-foot distance between each other. Id.

On September 29, 2020, Governor Baker issued Order 52, amending Order 46's mask requirement to apply to all persons over the age of five. Id. ¶ 18. Under the sector-specific standards applicable to places of worship, "all attendees and staff" must wear masks or cloth face coverings "while inside and while entering and exiting places of worship or otherwise participating in in-person services," regardless whether a six-foot distance can be maintained. Id. ¶ 19. Exceptions exist for individuals who are unable to wear a mask or cloth face covering due to a medical or disabling condition, and under Order 52 places of worship may refuse entry to persons who refuse to wear a mask or cloth face covering for non-medical reasons. Id. Under the December 11th Rules, a leader or celebrant conducting a religious service may remove his or her face covering while doing so, provided that he or she is able to

[16]

maintain a distance of at least six feet from other persons.
See December 11th Rules at 3.  Although not explicitly stated in
the sector-specific standards, an attendee may remove his or her
mask to receive communion.  Joint Finding ¶ 19.  Because Orders
46 and 52 apply to "all locations and venues," these Orders,
which apply in addition to the sector-specific standards,
require that more than ten persons attending indoor or outdoor
religious gatherings from different households must wear masks
regardless whether they can maintain a six-foot distance from
each other.  Id.

Sector-specific standards applicable to restaurants specify
that both employees and customers are required to wear face
coverings unless unable to do so due to a medical condition or
disability.  Id. ¶ 20.  Under these standards, employees are
required to wear face coverings at all times and customers must
wear face coverings unless seated at tables.  Id.

Pursuant to Orders 46 and 52, more than ten persons from
different households attending indoor or outdoor gatherings for
the purpose of political expression are required to wear masks
regardless whether they can maintain a six-foot distance from
other persons.  Id. ¶ 21.  Prior to these orders, and pursuant
to Order 31, persons attending indoor or outdoor gatherings for
the purpose of political expression were required to wear a mask

or cloth face covering only if they were unable to maintain a six-foot distance from other persons.  Id.

On November 2, 2020, Governor Baker issued Order 55, requiring all persons over the age of five to wear face-coverings in all public places, even if they maintain six feet of distance from others.  Def.'s Notice Suppl. Authority (Nov. 10, 2020), Ex. B, COVID-19 Order No. 55, Revised Order Requiring Face Coverings in Public Places § 1 (Nov. 2, 2020), ECF No. 26-2.

### D.   Effect of Governor Baker's Order on Delaney

Pursuant to Governor Baker's orders, when Delaney attends his Catholic services at his church in the Archdiocese of Boston, he must wear a mask and maintain a physical distance of at least six feet from other persons unless they live in the same household.  Joint Finding ¶ 23.  Due to the occupancy limit, Delaney's parish would be required to deny him entry if the occupancy limit were met or exceeded at the time he arrives at church.  Id. ¶ 24.  Moreover, the "format and structure" of Delaney's church services has changed, id. ¶ 25, and the parish churches that he attends have reduced the number of religious services and other events since Governor Baker's state of emergency, id. ¶ 27.

**E.    Protocols Mandated by the Archdiocese of Boston**

The Archdiocese of Boston, like many organizations in Massachusetts, instituted and continuously updates its own protocols for keeping its patrons safe during the pandemic.  See Current Protocols for Parishes in the Archdiocese of Boston, RCAB Office of Risk Management (last updated Dec. 11, 2020), https://www.rcabrisk.org/current-protocols-for-parishes-in-the-archdiocese-of-boston/; Liturgical Celebrations and Sacraments, Archdiocese of Boston (Apr. 8, 2020), https://www.bostoncatholic.org/sites/g/files/zjfyce871/files/2020-04/UPDATED_Liturgical%20Directives.pdf.[4]  The protocols mirror many of the protocols outlined in Governor Baker's orders and go above and beyond those precautions.  See Current Protocols for Parishes in the Archdiocese of Boston, supra.  The Archdiocese gives pastors the right to refuse entry to the church if a patron refuses to wear a mask, requires all volunteers to have their temperature taken, requires all parishioners to have their temperatures taken in a "Red Zone," and prohibits congregational singing.  Id.  The Archdiocese has also updated its liturgical

---

[4] This Court takes judicial notice of the relevant facts provided on these websites, which are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  See Fed. R. Evid. 201(b).

directives and issued a dispensation from the religious
obligation to attend weekly service until "public celebration of
Mass can be safely resumed." <u>Liturgical Celebrations and
Sacraments</u>, <u>supra</u>.

### F.   COVID-19 in the Commonwealth of Massachusetts

The parties stipulate to the following: "It has been proven
that the wearing of masks can slow the transmission of the
spread of the coronavirus.  However, it has not been
conclusively proven that the wearing of masks protects all mask-
wearers from being infected with COVID-19."  Joint Finding ¶ 22.

This Court also takes judicial notice of the following: as
of January 2021, over 20,700,000 people in the United States
have contracted COVID-19 since January 21, 2020, over 350,000
people have died from the virus, Massachusetts has reported over
32,000 new cases in the last seven days and over 380,000 cases
since January 21, 2020.  <u>United States COVID-19 Cases and Deaths
by State</u>, Centers for Disease Control and Prevention,
https://covid.cdc.gov/covid-data-
tracker/#cases_deathsper100klast7days (last visited Jan. 5,
2021).[5]  Massachusetts has suffered over 12,609 deaths from the
virus since January 21, 2020, including over 501 in the last

---

[5] This Court takes judicial notice of the relevant facts
provided on this website, which are "not subject to reasonable
dispute."  Fed. R. Evid. 201(b).

seven days alone.  Id.  Across the United States, the number of reported cases and deaths remain at record highs.  Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (last visited Jan. 5, 2021).

**III. RULINGS OF LAW**

Only Count II, Delaney's first amendment challenges, remain before this Court.  See Elec. Clerk's Notes (Sept. 2, 2020). Delaney makes four principal contentions: (1) that the occupancy limits at his place of worship infringe upon the free exercise of his religion; (2) that the social distancing guidelines applicable to churches infringe upon the free exercise of his religion; (3) that the mask mandate in his parish violates his religious beliefs and infringes upon the free exercise of his religion, and (4) that the mask mandate in all public places violates his religious beliefs and infringes upon the free exercise of his religion.  Compl. ¶¶ 131-184, 222-224, 261-268; see generally Pl.'s Opp'n Mem.  Governor Baker argues that Delaney lacks standing and, in the alternative, that Governor Bakers' orders do not violate Delaney's First Amendment rights. See Def.'s Mem. 10-30.

### A.   Article III Standing

Governor Baker first contends that Delaney fails to satisfy the standing requirements imposed by the case or controversy provision of Article III, Section II of the U.S. Constitution. Def.'s Mem. 10-30; see U.S. Const. art. III, § 2; Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992).

To establish Article III standing, a plaintiff must establish an injury in fact that is (1) concrete, particularized, and actual or imminent, (2) traceable to the challenged action of the defendant, and (3) redressable by a favorable ruling.  Lujan, 504 U.S. at 560-61.

### 1.   Legal Standard

Turning first to whether an alleged injury is concrete, particularized, and actual or imminent, the plaintiff must show that "he personally has suffered some actual or threatened injury . . . ." Valley Forge Christian Coll. v. Americans United for Separation of Church and State, 454 U.S. 464, 472 (1982) (quotations omitted).  "Concreteness and particularity are two separate requirements." Lyman v. Baker, 954 F.3d 351, 360 (1st Cir. 2020) (citing Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1545 (2016)).  An injury is "concrete" when it "actually exist[s]." Id. (quotations omitted).  An injury is "particularized" when it "affect[s] the plaintiff in a personal and individual way," Lujan, 504 U.S. at 560 n.1, that goes

beyond widely shared "generalized grievances about the conduct
of the government," Lyman, 954 F.3d at 361 (citing Becker v.
Fed. Election Comm'n, 230 F.3d 381, 390 (1st Cir. 2000)).  An
imminent injury is one where the threatened harm is "certainly
impending," as opposed to mere "allegations of possible future
injury."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013)
(brackets and emphases omitted); Lujan, 504 U.S. at 564 n.2.
Allegations of future harm absent any demonstration that said
future harm is "certainly impending" is too speculative to
satisfy Article III.  Clapper, 568 U.S. at 401, 409.

Next, to satisfy Article III standing, the injury must be
traceable to the challenged action of the defendant.  Lujan, 504
U.S. at 560.  This "traceability" element, essentially a
causation element of Article III standing, "requires the
plaintiff to show a sufficiently direct causal connection
between the challenged action and the identified harm."
Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.,
958 F.3d 38, 47 (1st Cir. 2020) (quoting Katz v. Pershing, LLC,
672 F.3d 64, 71 (1st Cir. 2012)).  Although an indirect causal
relationship is not prima facie fatal, an injury is less likely
to satisfy this requirement where the causal chain between the
defendant's action and the alleged harm depends on actions of a
third party.  See id. at 48 (citing Allen v. Wright, 468 U.S.
737, 757-59 (1984) (holding that the plaintiff lacked standing

where the actions of multiple third parties acting independently were critical to the plaintiff's alleged causal chain); Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 42-45 (1976) (holding that the plaintiff lacked standing because the decisions of independent hospitals where critical to the causal chain despite the hospitals being subject to the nonenforcement of the statute at issue)).

Finally, the injury must be redressable by a favorable ruling. Lujan, 504 U.S. at 561-62. A favorable ruling need not redress the entire injury, but the plaintiff must demonstrate that a favorable ruling will at least lessen the injury. See Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 318 (1st Cir. 2012) (holding that the plaintiff had standing where it demonstrated that if the laws at issue were preempted, the plaintiff would have significantly greater business opportunities). This demonstration is "'substantially more difficult' to establish" when the plaintiff's injury arises from the government's regulation of someone else. Lujan, 504 U.S. at 562 (quoting Allen, 468 U.S. at 758). There, both "causation and redressability . . . hinge on the response of the regulated (or regulable) third party to the government action or inaction . . . ." Id. In such indirect-regulation circumstances,

The existence of one of more of the essential elements of
standing "depends on the unfettered choices made by
independent actors not before the courts and whose exercise
of broad and legitimate discretion the courts cannot
presume either to control or to predict," and it becomes
the burden of the plaintiff to adduce facts showing that
those choices have been or will be made in such manner as
to produce causation and permit redressability of injury.

Id. (citations omitted) (quoting ASARCO Inc. v. Kadish, 490 U.S.
605, 615 (1989)).

### 2. Delaney's Occupancy-Limit Challenge Is Not Particularized, Actual, or Imminent.

Delaney's first challenge to Governor Baker's orders, that
his First Amendment right to freely exercise his religion is
infringed by the maximum occupancy limits, fails at this first
requirement.  See Lujan, 504 U.S. at 560; Lyman, 954 F.3d at
360; Joint Finding ¶¶ 23-28; Compl. ¶¶ 261-268.  This injury is
not concrete and particularized, nor is it actual or imminent.
See Lujan, 504 U.S. at 560; Lyman, 954 F.3d at 360; Joint
Finding ¶¶ 23-28.

The joint finding is devoid of any evidence that Delaney
was ever denied access to his parish church, let alone that such
a denial was due to Governor Baker's occupancy limit.  See Joint
Finding ¶¶ 23-28.  Because the injury of being denied access to
his church does not exist, this injury is not concrete.  See
Lyman, 954 F.3d at 360.  Similarly, there is no injury to be
particularized to Delaney, as he has not been affected "in a
personal and individual way," Lujan, 504 U.S. at 560 n.1, and

his allegations amount to a "generalized grievance about the conduct of the government," Lyman, 954 F.3d at 361.

The joint finding only demonstrates a possibility of injury in a hypothetical scenario where Delaney arrives at his parish to find the maximum occupancy reached.[6]  See Joint Finding ¶ 24. This potential for denial remains too speculative for this Court to find it "certainly impending," particularly without any showing that Delaney has been denied entry in the past or that the parish church regularly denies parishioners from entering due to Governor Baker's occupancy limit.  See Clapper, 568 U.S. at 409; Joint Finding ¶¶ 23-28.

Absent any showing that Delaney has been subject to such actual exclusion, or that such harm is "certainly impending" the next time Delaney arrives at his parish door, he lacks standing to challenge the Orders.[7]  See Clapper, 568 U.S. at 409.

---

[6] The joint finding states that Delaney's "parish church[] would be required to deny entry to him if the occupancy limit were already met or exceeded at the time of his attempt to obtain admittance to a parish church; and, in such circumstances, a parish church would be required to exclude him from activities occurring in the church building at that time, including a Holy Mass."  Joint Finding ¶ 24.  The joint finding lacks any evidence that the number of regularly attending parishioners exceeds twenty-five, forty, or fifty percent of the church's capacity -- evidence without which this Court cannot infer the likelihood that Delaney could be denied access in the future.  See Clapper, 568 U.S. at 409; Lujan, 504 U.S. at 560.

[7] For the same reasons, Delaney's challenge to Order 38, which prohibited outdoor activities with the exception of those for the purpose of political expression, fails for lack of

###    3.    Delaney's Indoor Mask Mandate and Social
          Distancing Challenges Are Not Redressable.

Delaney also argues that the mask mandate violates his

religious beliefs and therefore his First Amendment right to the

free exercise of his religion and that the social distancing

guidelines for churches are an affront to the free exercise of

his religion.  <u>See</u> Pl.'s Mem. 11-14; Pl.'s Opp'n Mem. 9-13.

Setting aside, for a moment, the mask mandate outside of

Delaney's parish, the mask mandate within his parish and

Delaney's injury from the social distancing guidelines within

his parish fail to allege a redressable injury.[8]  <u>See</u> <u>Lujan</u>, 504

_____

standing.  <u>See</u> <u>Clapper</u>, 568 U.S. at 409.  The joint finding is
devoid of any evidence that Delaney had planned to attend a
religious ceremony outside, and therefore the injury is not
concrete, particularized, and actual or imminent. <u>See</u> <u>id.</u>

   [8] Regarding Delaney's injury from the social distancing
order, Delaney alleges the following:

> Plaintiff's closeness to God is heightened in his
> communion with fellow Catholics in close proximity.
> Whether it is a hug in greeting, a handshake in the
> gesture of peace, fellowship after Holy Mass, or the
> resonance felt in a chorus of song, visceral moments
> of communion are essential in the practice of his
> faith.  These acts of sacred ritual and human
> connection are essential to being Catholic.

Compl. ¶ 168 (citing <u>Psalms</u> 100:2).  Regarding Delaney's
injury from the mask mandate, Delaney alleges that "being
forced to wear a mask is contrary to his faith and an
affront to God."  Compl. ¶ 222 (citing 2 <u>Corinthians</u> 3:12).
The parties did not stipulate to this injury in the joint
finding, <u>see generally</u> Joint Finding, but for the reasons
articulated in Part III.B., <u>infra</u>, this Court finds that

U.S. at 562 (holding that the plaintiff has the burden of demonstrating causation and redressability for indirect causation standing).  Delaney alleges an indirect-causation injury: Delaney is claiming that Governor Baker's orders are the cause of his parish's protocols which are infringing on the exercise of his religion.  See Pl.'s Mem. 7; see generally Joint Finding.  There is no evidence, however, that the Archdiocese instituted its protocols only because of Governor Baker's orders, and even had it done so, there is no evidence that a favorable ruling would result in redress of Delaney's injury. See generally Joint Finding.  The joint finding is devoid of any evidence of whether or how Delaney's parish would operate differently in the absence of such orders.  As discussed above, the Archdiocese of Boston instituted its own protocols to protect its parishioners and other attendees.  See Liturgical Celebrations and Sacraments, supra.  Although many of these protocols reflect Governor Baker's orders and the sector-specific standards, the Archdiocese exercised its own broad and legitimate discretion in setting additional protocols to keep its attendees safe, such as its dispensation from the religious obligation to attend mass weekly and its prohibition on congregational singing.  See id.  Delaney ultimately bears the

---

they were implied and uncontested.  See Lujan, 504 U.S. at 560; Lyman, 954 F.3d at 360.

burden to "adduce facts showing that those choices have been or
will be made in such a manner as to produce causation and permit
redressability of injury." See Lujan, 504 U.S. at 562.  Delaney
has not proven that, but for Governor Baker's orders, the
Archdiocese would institute rules that would remedy his wearing
a mask inside and his social distance from non-family members in
church.  See generally Joint Finding.  Failing to meet this
burden makes the prospect of redressability too speculative, and
Delaney therefore lacks standing to challenge the mask mandate
and social distancing requirements within parishes.  See Lujan,
504 U.S. at 562.

### B.   Delaney's Mask-Mandate Challenge in Public Places Fails Under Both the "Tiers of Scrutiny" and Jacobson.

Returning to the mask mandate outside his parish, Delaney
has standing to challenge this action by Governor Baker because
this direct-causation injury does not suffer the same
infirmities as the other indirect-causation injuries discussed
above.  This Court is not in the business of interpreting the
Bible and has no reason to question the sincerity of Delaney's
religious beliefs.  Similarly, Governor Baker does not question
the sincerity of Delaney's religious faith.  See generally Joint
Finding.  Accordingly, this Court finds Delaney's faith and the
representations he makes regarding his interpretation of the
Bible to be sincere and implied in the joint finding.  See

Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 531
(1993) (noting that it was not for the Supreme Court to decide
whether Santeria was a religion, and instead taking the
petitioners' uncontested desire to sacrifice animals for
religious purposes as sincere).

        **1.    Legal Standard**

      Delaney and Governor Baker dispute the legal standard to be
applied in this case.  Governor Baker argues that this Court
ought apply the standard set forth in Jacobson v. Massachusetts,
197 U.S. 11 (1905), while Delaney argues that this Court ought
apply the traditional "tiers of scrutiny."  See Pl.'s Mem. 12;
Def.'s Mem. 13.

      In Jacobson, the Supreme Court upheld a Massachusetts
statute granting municipal boards of health the authority to
mandate vaccination and revaccination.  197 U.S. at 12.  The
Supreme Court applied a standard of review dissimilar from the
tiers of scrutiny now synonymous with constitutional review
because Jacobson predates the tiers of scrutiny by thirty to
sixty years depending on which academic you ask.  See United
States v. Caroline Prods. Co., 304 U.S. 144, 152 n.4 (1938);
Lindsay F. Wiley & Stephen I. Vladeck, Coronavirus, Civil
Liberties, and the Courts: The Case Against "Suspending"
Judicial Review, 133 Harv. L. Rev. 179, 193 (2020).  Jacobson's
standard affords States enduring a society-threatening epidemic

the discretion reasonably to restrict constitutional protections
so long as the regulations have a "real or substantial relation"
to protecting the public health and safety, and the restraint is
not "beyond all question, a plain, palpable invasion of the
rights secured" by the Constitution.  197 U.S. at 29, 31.

Delaney and a chorus of scholars, Justices, and courts
argue that Jacobson's standard is improper, particularly when
applied to First Amendment challenges.  See, e.g., Roman
Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 69-72
(2020) (per curiam) (Gorsuch, J., concurring); Calvary Chapel
Dayton Valley v. Sisolak, 140 S. Ct. 2603, 2608 (2020) (mem.)
(Alito, J., dissenting); County of Butler v. Wolf, Civil Action
No. 2:20-cv-677, 2020 WL 5510690 (W.D. Pa. Sept. 14, 2020);
Wiley & Vladeck, supra, at 179-83.  In a speech to the
Federalist Society, Justice Alito recently cautioned that
religious liberties were under attack and criticized the
application of Jacobson to First Amendment challenges.  The
Federalist Society, Address by Justice Samuel Alito [2020
National Lawyers Convention], YouTube (Nov. 12, 2020),
https://www.youtube.com/watch?v=VMnukCVIZWQ.  More recently in
his concurring opinion in Roman Catholic Diocese of Brooklyn v.
Cuomo, Justice Gorsuch criticized the application of Jacobson to
these challenges and urged courts to apply the tiers of scrutiny

approach during the pandemic.  141 S. Ct. at 69-72 (Gorsuch, J., concurring).

Arguments advanced by Delaney and Jacobson's adversaries fall into two classes.  The first class of arguments is that Jacobson is distinct, and the tiers of scrutiny developed over the past century implicitly overruled Jacobson, replacing its "real or substantial relation" review during times of medical emergency with the tiered approach.  See Wolf, Civil Action No. 2:20-cv-677, 2020 WL 5510690, at *11-16.  The Supreme Court, however, has not yet ruled on whether the tiers of scrutiny overrule Jacobson despite recent opportunity to do so.  See Roman Catholic Diocese of Brooklyn, 141 S. Ct. at 67.  Since this crisis began, Jacobson has been cited positively and negatively by Justices of the Supreme Court in both concurrences and dissents, see id. at 70 (Gorsuch, J., concurring); Sisolak, 140 S. Ct. at 2608 (Alito, J., dissenting); South Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613 (2020) (mem.) (Roberts, C.J., concurring), and until the Supreme Court overrules Jacobson, this Court is bound by stare decisis to apply Jacobson harmoniously with the precedent developed under the tiers of scrutiny, see United States v. Moore-Bush, 963 F.3d 29, 31 (1st Cir. 2020) ("Under the doctrine of stare decisis, all lower federal courts must follow the commands of the Supreme Court, and only the Supreme Court may reverse its prior

precedent."), reh'g en banc granted, opinion vacated, 982 F.3d
50 (mem.) (1st Cir. Dec. 9, 2020).

     The second class of arguments against applying Jacobson's
standard pertains to the temporal requites of a "medical
emergency." Roman Catholic Diocese of Brooklyn, 141 S. Ct. at
70 (Gorsuch, J., concurring); Wolf, Civil Action No. 2:20-cv-
677, 2020 WL 5510690, at *8.  Jacobson's adversaries proffer
that any exigency that once existed has since expired because of
the many months that have passed since the virus first started
overwhelming our hospitals.  See Wolf, No. 2:20-cv-677, 2020 WL
5510690, at *8.  Exigency, however, is a fact-intensive notion.
In the last seven days another 501 residents died, raising the
death toll in Massachusetts to 12,609.  United States COVID-19
Cases and Deaths by State, supra.  The number of weekly reported
cases has remained at grim record highs for the last several
weeks, and Massachusetts is opening field hospitals because its
existing infrastructure is overwhelmed with patients.  Kimberly
Bookman, With Hospitals 'Under Immense Pressure,' Baker Begs
People to Stay Home for Holidays, WHDH, Dec. 21, 2020,
https://whdh.com/news/with-hospitals-under-immense-pressure-
baker-begs-people-to-stay-home-for-holidays/; Mark Pratt,
Massachusetts Field Hospital Scheduled to Open Sunday,
Associated Press, Dec. 3, 2020,
https://apnews.com/article/public-health-coronavirus-pandemic-

486e851a6881b1da8564d13326cbada0.   There certainly will be a day
in the hopefully near future when this crisis's exigency expires
in Massachusetts, but it is not today.

Whether Jacobson controls in First Amendment challenges is
important where the state action is not "neutral and of general
applicability."   See Church of Lukumi, 508 U.S. at 531.   Under
the tiers of scrutiny, "[a] law failing to satisfy these
requirements must be justified by a compelling governmental
interest and must be narrowly tailored to advance that
interest."   Id. at 531-32.   The Supreme Court has ruled that
stopping the spread of society-threatening disease is
"unquestionably" a compelling interest.   Roman Catholic Diocese
of Brooklyn, 141 S. Ct. at 67.   The relationship between the
tiers of scrutiny approach and Jacobson is that the tiers
require the measures taken to be "narrowly tailored," while
Jacobson only requires them to have a "real or substantial
relation," a much lower standard.   Compare Church of Lukumi, 508
U.S. at 531-36, with Jacobson, 193 U.S. at 31.

Last month, in Roman Catholic Diocese of Brooklyn, the
Supreme Court shed some light on this debate without resolving
it.   Without overruling Jacobson, the Supreme Court applied the
tiers of scrutiny to enjoin the governor of New York from
enforcing COVID-19 regulations against places of worship because
they were singled out for "especially harsh treatment."   Roman

<u>Catholic Diocese of Brooklyn</u>, 141 S. Ct. at 66.  There, places
of worship were subject to a ten-person limit in zones where
essential businesses had no limit, and a twenty-five-person
limit in zones where non-essential businesses could "decide for
themselves how many persons to admit."  <u>Id.</u>  Moreover, the
applicants made a strong showing that the governor specifically
targeted the "ultra-Orthodox [Jewish] community."  <u>Id.</u>
(quotations omitted).  The regulations were neither neutral nor
of general applicability, and the applicants, therefore, had
proved a likelihood of success on the merits.  <u>Id.</u> at 67 (citing
<u>Church of Lukumi</u>, 508 U.S. at 546).  The Supreme Court held that
"[s]temming the spread of COVID-19 is unquestionably a
compelling interest," and regulations made in furtherance of
this interest must be narrowly tailored.[9]  <u>Id.</u> at 67.

---

[9] Although Delaney's challenges here lack standing, the
Supreme Court's language suggests that had Delaney demonstrated
standing to challenge Governor Baker's occupancy requirements,
these regulations would nevertheless be upheld under the
stricter tiers of scrutiny analysis.  <u>See</u> <u>Roman Catholic Diocese
of Brooklyn</u>, 141 S. Ct. at 67.  The Supreme Court explicitly
discussed percentage-based occupancy limits as a less
restrictive and more narrowly tailored approach, stating,
"[T]here are many other less restrictive rules that could be
adopted to minimize the risk to those attending religious
services.  Among other things, the maximum attendance at a
religious service could be tied to the size of the church or
synagogue."  <u>Id.</u>  These are precisely the types of limits that
Governor Baker has instituted and amended previous orders to
enforce, and where non-percentage limits exist, Governor Baker
has exempted places of worship and religious ceremonies.  <u>See</u>
COVID-19 Order Nos. 13, 35, 37, 38, 46, 52, 54, 57, 59.

### 2.   Traditional Tiers of Scrutiny Free Exercise Analysis

Unlike the state action before the Supreme Court in <u>Roman Catholic Diocese of Brooklyn</u>, Governor Baker's mask mandate in public places is "neutral and of general applicability."  <u>See Church of Lukumi</u>, 508 U.S. at 531.

State action is not neutral and of general applicability when

> the object of [the state action] is to infringe upon or restrict practices because of their religious motivation . . . .  To determine the object of [the] law, [this Court] must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face.  A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context.

<u>Id.</u> at 533.  Governor Baker's mask mandate in all public places is facially neutral.  <u>See</u> Def.'s Notice Suppl. Authority (Nov. 10, 2020), Ex. B, COVID-19 Order No. 55 § 1 ("[A]ll persons in Massachusetts over the age of five years old are required to wear a mask or cloth face covering over their mouth and nose when in a public location, whether indoors [or] outdoors.").

This Court must also consider "'subtle departures from neutrality.'" <u>Masterpiece Cakeshop, Ltd.</u> v. <u>Colo. Civil Rights Comm'n</u>, 138 S. Ct. 1719, 1731 (2018) (quoting <u>Church of Lukumi</u>, 508 U.S. at 534).  In determining whether a state action's object is neutral, courts consider "the effect of [the] law in

its real operation" and the extent to which it is underinclusive
of its goal.  Church of Lukumi, 508 U.S. at 535, 543.  A law
fails this test where the government "in pursuit of legitimate
interests . . . in a selective manner impose[s] burdens only on
conduct motivated by religious belief . . . ."  Id. at 543.
Here, mandating all residents to wear a mask burdens the conduct
of all residents, not exclusively conduct motivated by religious
belief.  See id.; Def.'s Notice Suppl. Authority (Nov. 10,
2020), Ex. B, COVID-19 Order No. 55 § 1.  The orders are not
underinclusive, because they apply to all persons in
Massachusetts.  See Church of Lukumi, 508 U.S. at 543.  The
orders do not subtly target religious conduct for distinctive
treatment, and there is no evidence that these orders are the
product of animus.  See id. at 534; see generally Joint Finding.
Therefore, as the orders are of general applicability, they need
only be rationally related to the interest in stemming the
spread of COVID-19.  See Church of Lukumi, 508 U.S. at 531
(citing Employment Div., Dept. of Human Resources of Ore. v.
Smith, 494 U.S. 872 (1990)).  These orders satisfy this
standard.  Governor Baker's orders for all residents to wear
masks are rationally related to the interest in stemming the
spread of COVID-19 because, as the parties stipulated in the
joint finding, "[i]t has been proven that the wearing of masks
can slow the transmission of the spread of the coronavirus."

Joint Finding ¶ 22.  Delaney's challenge, therefore, fails the
First Amendment test developed under the tiers of scrutiny
approach.

### 3.  _Jacobson_ Analysis

Delaney's challenge suffers the same fate under the more
deferential Jacobson standard.  See Calvary Chapel of Bangor v.
Mills, 459 F. Supp. 3d 273, 284 (D. Me. 2020).  "Although a
government cannot use a health crisis as a pretext for trampling
constitutional rights, the Supreme Court has long recognized
that 'a community has the right to protect itself against an
epidemic of disease which threatens the safety of its members.'"
Id. (quoting Jacobson, 197 U.S. at 27).  As discussed above,
Massachusetts is suffering a public health crisis, the exigency
of which has not yet diminished.  See supra Part III.B.1.
"During that temporary time and in those narrow contexts,
Jacobson instructs that courts should only overturn state action
when it lacks a 'real or substantial relation to the protection
of the public health' or represents 'a plain, palpable invasion
of rights secured by the fundamental law.'"  Calvary Chapel of
Bangor, 459 F. Supp. 3d at 284 (quoting Jacobson, 197 U.S. at
31).  Given the nature of the virus and the parties' stipulation
"that the wearing of masks can slow the transmission of the
spread of the coronavirus," Joint Finding ¶ 22, Governor Baker's
orders requiring residents to wear masks have a "real [and]

substantial relation to the protection of the public

health . . . ."   See Jacobson, 197 U.S. at 31.

Under Jacobson, the state action must not be a "plain,

palpable invasion of rights secured by the fundamental law," yet

the Supreme Court there gave but cursory instructions concerning

how to go about this analysis.   See id. ("Whatever may be

thought of the expediency of this statute, it cannot be affirmed

to be, beyond question, in palpable conflict with the

Constitution.").   Other courts have more recently informed their

analysis whether the state action is a plain and palpable

invasion with precedent developed under the tiers of scrutiny

approach.   See Bimber's Delwood, Inc. v. James, 20-CV-1043S,

2020 WL 6158612, at *11-20 (W.D.N.Y. Oct. 21, 2020) (applying

the traditional tests for constitutional violations to determine

whether the state action qualified as a plain and palpable

invasion under Jacobson); Robinson v. Marshall, 454 F. Supp. 3d

1188, 1200-02 (M.D. Ala. 2020) (applying the undue burden test

for abortion regulations developed under the tiers of scrutiny

to determine whether the state action qualified as a plain and

palpable invasion under Jacobson), appeal dismissed sub nom.

Robinson v. Att'y Gen., 2020 WL 3989457 (11th Cir. May 5, 2020)

(per curiam).   Doing so, however, renders Jacobson and its

articulated deference irrelevant.   For Jacobson to be a separate

standard applied during a public health crisis to afford greater

deference to public health officials, that which qualifies as a plain and palpable invasion logically must be in a class at the upper limits of, if not above and beyond, invasions tolerable under the traditional tiers of scrutiny approach.  Compare Church of Lukumi, 508 U.S. at 531-36, with Jacobson, 193 U.S. at 31.  Given the record, this Court finds Delaney's injury falls short of such a class, see Joint Finding ¶¶ 23-28, and upholds the constitutionality of Governor Baker's orders under Jacobson's standard, see 193 U.S. at 31.

## IV.  CONCLUSION

For these reasons, the Court finds and rules and, thus declares, that Governor Baker's orders did not violate Delaney's constitutional rights.


**SO ORDERED.**


/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE